# CASES DETERMINED

BY THE

# SUPREME COURT

OF THE

## STATE OF MISSOURI

AT THE

APRIL TERM, 1898.

(*Continued from Volume 144.*)

---

THE STATE v. BAUERLE, *Appellant.*

Division Two, June 14, 1898.

1. **Juror**: QUALIFICATION: EXCUSED. A venireman who testified that he was opposed to capital punishment on circumstantial evidence; that if the evidence convinced him of defendant's guilt beyond a reasonable doubt, he believed he could convict him, but that it would take a great deal of evidence and would have to be very strong, was rightfully excused from jury service. There is no reason why the State should shoulder the unnecessary burden of satisfying all the whims of such a juror.

2. ————: FAIR AND INDIFFERENT. A juror must be indifferent between the State and the defendant, and whether or not he is, is a fact to be determined by the trial judge.

3. **Murder**: EVIDENCE: SUDDEN DEATH. An instruction that told the jury that the only evidence of the commission of a crime was that deceased came to her death suddenly, was properly refused, under the circumstances of this case.

4. ————: SECOND DEGREE: INSTRUCTION: MISLEADING. An instruction on murder in the second degree is set out in the opinion, and is *held* not to be misleading, and to have been often approved by this court.

State v. Bauerle.

5. ——: PRESUMPTIONS: INNOCENCE: SUICIDE. While the law presumes the defendant innocent of murder, there is also a presumption against the suicide of deceased, and while the presumption against suicide does not overcome the presumption of innocence, yet the jury are permitted to consider it in arriving at a rational conclusion as to defendant's guilt or innocence.

6. ——: EVIDENCE. The evidence in this case is reviewed at length, and the conclusion reached that it was sufficient to sustain a verdict convicting defendant of murder in the second degree.

7. ——: IN SECOND DEGREE: MALICE: PRESUMPTION. When it appears that the defendant shot the deceased in a vital part, with a deadly weapon, the law presumes the malice necessary to make the consequent killing murder in the second degree, in the absence of any and all palliating circumstances.

8. ——: EVIDENCE: REJECTING EVIDENCE. This court can not reject *in toto* the evidence of a witness at the trial, without invading the province of the jury.

9. ——: ——: ——: IMPEACHED WITNESS. When a witness occupies a disinterested, independent position at the trial, and no ill will toward the defendant or motive is shown why he should have borne false witness against him, the fact that he has been impeached generally will not so completely destroy his evidence that a court or jury is bound to reject it, if it corresponds with the truth and is consistent with the controlling facts of the case.

10. ——: ADMISSIONS BY DECEASED: SUICIDE. Conversations with deceased as to her intention to commit suicide, where suicide is the defense, are not admissible or competent evidence. They are neither *res gestae* nor dying declarations.

11. ——: NEW TRIAL: NEW EVIDENCE. Affidavits in the motion for a new trial which simply impeach the testimony of a witness given on the trial, are not sufficient grounds for a new trial.

*Appeal from Lafayette Criminal Court.*—HON. JOHN E. RYLAND, Judge.

AFFIRMED.

*John Welborn* and *John S. Blackwell & Son* for appellant.

(1) The evidence in this case is not of sufficient weight, potency, or probative force to support the

verdict, and the trial court committed error in not setting aside the verdict and granting defendant a new trial. (2) Instruction number 3 on the part of the State does not properly or legally define the probative force and effect of circumstantial evidence, and does not properly or legally declare the law as to the inferences and deductions to be drawn therefrom. *State v. Moxley*, 102 Mo. 389; *State v. Taylor*, 111 Mo. 541; *State v. Cable*, 117 Mo. 384. (3) Instruction number 4 on the part of the State does not properly or legally define the crime of murder in the second degree. It is misleading. *State v. Hays*, 23 Mo. 287; *State v. Holmes*, 54 Mo. 133; *State v. Underwood*, 57 Mo. 40; *State v. Grant*, 76 Mo. 236; *State v. Tabor*, 95 Mo. 585; *State v. Evans*, 124 Mo. 397. (4) Instruction number 9 asked for by the defendant would have enabled the triers of the facts to see that something else was necessary to support a verdict of guilty other than the sudden, and (by the State) unexplained death of the deceased. *State v. Moxley*, 102 Mo. 390. (5) In the trial of this case the State had to rely and did rely solely upon circumstantial evidence to convict the defendant of the crime with which he was charged. The principal witness on the part of the State was the drunken, impeached and corrupt negro witness, James Misner. His is the only testimony in the case as to what the defendant said to the girl on the night before the shooting, and as to what occurred on the back porch on the following morning, and it was upon his testimony that the State relied for a conviction. The testimony in this case and the affidavits filed in support of the motion for a new trial show that said Misner was and is thoroughly degraded and morally corrupt. *State v. Prim*, 98 Mo. 368; *State v. Young*, 119 Mo. 525. (6) The evidence in this case and the

affidavits filed in support of defendant's motion for a
new trial show conclusively that the witness James
Misner committed perjury; that his testimony was
willfully, corruptly and maliciously false, and, as shown
by the affidavit of James Gates, that it was given on
the part of the State for the admitted purpose of con-
victing the defendant. R. S. 1889, sec., 2240, 2241;
*Rickroad v. Martin*, 43 Mo. App. 597. (7) The court
committed error in refusing to grant defendant a new
trial on the ground of newly discovered evidence. It
is also true that a part of the evidence consists of
threats or statements of the deceased that she intended
to kill herself. If these threats or statements of the
deceased stood alone and were unaccompanied by any
physical acts that would tend to show her intention to
commit suicide, then the same would be inadmissible
as evidence under the decisions of this court in *State v.
Punchon*, 124 Mo. 448; and *State v. Fitzgerald*, 130
Mo. 407. But the threats of the deceased in the case at
bar were accompanied by the physical attempt to carry
them into execution. The evidence in this case shows
that the girl attempted to buy morphine at the drug
store of Crenshaw & Young; that this attempt was
made only a few days before her death and during the
time that she was telling Kirk Wilson and Mary Wilson
that she intended to kill herself. These threats, made
under these circumstances, were part of the *res gestae*
and are admissible under the cases last above cited.
Part of the newly discovered evidence is admissible to
show the gloomy, despondent and troubled condition
of the girl just prior to her death. *State v. Bailey*, 94
Mo. 311; *State v. Moberly*, 121 Mo. 610; *State v. Cur-
tis*, 77 Mo. 268; *State v. Murray*, 91 Mo. 103; *Keenan
v. People*, 104 Ill. 385; Graham & Waterman on New
Trials, 172; *Casey v. State*, 20 Neb. 138.

*Edward C. Crow*, Attorney-General, for the State.

(1) The instruction properly defined murder in the second degree. *State v. O'Hara*, 92 Mo. 59; *State v. Wilson*, 98 Mo. 447; *State v. Curtis*, 70 Mo. 596. (2) The next assignment of error is that the court should have given instruction 9, asked by defendant, announcing the proposition that because deceased came suddenly to her death was not sufficient to warrant the jury in finding that the death of deceased was the result of a criminal act, and counsel for defendant cited case of *State v. Moxley*, 102 Mo. 309, where it was said a similiar instruction should have been given. But the facts in that case were materially different from the facts in the case at bar. But in the case at bar the evidence is direct and positive that the death of deceased was caused by a pistol shot and that the pistol ball that killed her came from the revolver found on the floor of the room and which belonged there. (3) The rule is that a verdict will not be disturbed on appeal if there is evidence sufficient to warrant the jury in finding such a verdict. *State v. Green*, 117 Mo. 298; *State v. Hicks*, 92 Mo. 432; *State v. Musick*, 71 Mo. 401; *State v. Jackson*, 106 Mo. 174; *State v. Flora*, 109 Mo. 293; *State v. Kinney*, 81 Mo. 101; *State v. Hert*, 89 Mo. 590. (4) The general proposition is under the decisions in this State that a verdict will not be disturbed on appeal on the ground that it is not supported by the evidence unless there is total failure of the evidence or it is so weak that the necessary inference is that the verdict was the result of passion, prejudice or partiality. *State v. Howe*, 110 Mo. 628; *State v. Glahn*, 97 Mo. 679; *State v. Cook*, 58 Mo. 546; *State v. Hilterbrand*, 116 Mo. 543; *State v. Latimer*, 116 Mo. 524; *State v. Minton*, 116 Mo. 605; *State v. Thomas*, 78 Mo. 327. (5) In the case at bar there is

nothing in the record to show .that the court did not weigh the evidence in passing on the motion for a new trial, and in the absence of anything to show the contrary the rule is that the law constantly presumes public officers charged with the performance of official duty have not neglected the same, but have duly performed it at the proper time and in the proper manner. Mechem on Public Officers, sec. 579; Wharton's Crim. Law [9 Ed.], sec. 835; *U. S. v. Weed*, 5 Wall. 62; *Rolland v. Com.*, 82 Pa. ·St. 306; *People v. Stephens*, 5 Hill (N. Y.), 616. (6) The statements of the deceased about suicide alleged to have been made were not, so far as the record shows, accompanied by any acts, therefore, were inadmissible. *State v. Fitzgerald*, 130 Mo. 407. (7) The newly discovered evidence was by the court properly overruled, as it did not tend to prove any matter of defense, but merely to impeach and contradict a witness for the State, and was cumulative and not sufficient to grant a new trial, that is as to the affidavits of Charles Williams and Robert Johnson. *State v. Smith*, 65 Mo. 313; *State v. Butler*, 67 Mo. 59; *Snyder v. Burnham*, 77 Mo. 52; *State v. Stewart*, 127 Mo. 290; *State v. Woodward*, 95 Mo. 129; *State v. Rockett*, 87 Mo. 666; *State v. Willoughby*, 76 Mo. 215.

GANTT, P. J.—On an indictment for murder in the first degree defendant was convicted of murder in the second degree and sentenced to imprisonment in the penitentiary for ten years by the criminal court of Lafayette county.

The controlling facts may be briefly summarized. Amelia Bauerle was the granddaughter of Louis Bauerle and the niece of the defendant, Otto Bauerle. A short time prior to the death of Amelia Bauerle, on April 26, 1896, her parents had moved from Lexington

in this State to some place in the State of New York, and left the girl with her grandfather in Lexington. The old gentleman lived in the second story of a brick building on Main street which he owned. On Sunday morning April 26, 1896, a pistol was discharged in the apartments in which Amelia lived, and her uncle, John Bauerle, and his wife, who ran a restaurant in the west room on the ground floor of his father's said building, and others in the neighborhood, ran up stairs and found Amelia lying on the floor and a pistol lying by her side. Dr. P. S. Fulkerson was summoned at once by the defendant, Otto Bauerle, and found Amelia lying on the floor very pale and pulseless. She lived about thirty minutes after he reached her. He found a gun shot wound in the pit of her stomach. Dr. Emmett Fulkerson was coroner at that time. They made a *post mortem* examination and found the ball resting on the spinal column. It had entered about the center of the pit of the stomach and ranged a little upwards and to the left. They removed the ball and found some large blood vessel had been cut and a large hemorrhage had ensued. Dr. Fulkerson testified she never spoke but once after he reached her, and that was simply to say very indistinctly, "Turn me over." The wound and copious hemorrhage caused her death. Her clothing was powder-burnt.

The doctor testified that defendant was greatly alarmed or excited when he came for him and asked the doctor to hurry. Dr. Fulkerson reached the wounded woman in five minutes after defendant summoned him. His office was near. He did not recollect that the defendant was in the room after he arrived until she died. Mat Boldridge was in the room either when he got there or came in while he was there. On the Saturday evening previous to the homicide next morning, *James Misner*, a witness, testified

he saw the defendant and the deceased in the alley in the rear of the Bauerle building. Deceased had just inquired of witness where defendant was, and about that time or soon after they passed the witness, and as they did so defendant said to deceased "I'll soon get rid of you." He seemed very angry. On the same day another witness, Vinegar, testified that he saw defendant and deceased together at the back gate of the Bauerle lot. Defendant took hold of deceased and they went into the back yard. On Sunday morning Vinegar was in the alley and heard the shot fired which killed Amelia. He testified he went at once to the Bauerle house. When he reached there he saw John Bauerle, the uncle of deceased and brother of defendant, going up the steps out of his restaurant, and saw defendant go out of the hall into the kitchen and sit down by the window. He saw Mr. Clark, the city marshal, and Mr. Dickerson up there. Misner also testified that he was employed to clean up a saloon near by and that on Sunday morning after cleaning the saloon he came down the alley and went in back of Mr. Hearle's and into the yard to a water-closet. Hearle's lot joins Bauerle's, and is separated by a fence. There is a back porch to Bauerle's house seven or eight feet from the ground. He says from where he stood in the back yard nothing prevented his seeing on Bauerle's porch. He then details what he saw and heard in these words: "When I went out of the back yard of Mr. Hearle's, Mr. Bauerle, the defendant, was sitting on the back porch and had a pistol in his hand. I thought he was loading or greasing it, I don't know which. He was sitting on the southwest corner of the porch; he had the pistol in his left hand; with the other hand he was doing something, I don't know whether he was loading it or greasing it. He was sitting down when I first saw him. A little while after that this girl came

out with something in her hand, I don't know whether it was a rag or what; this girl was Amelia Bauerle; she came out of the house; she came out of a hallway on to the porch, and when she came out she said something to him, I don't know exactly what she said, and he jumped up and they got to scuffling and I heard her say, 'You are a liar' to him, and he went up to her on the porch, I could not see exactly what he did with the pistol. She pulled loose from him and went back into the house; he went on in behind her. I could not see which hand he held the pistol in as he went in. I did not see the pistol while they were scuffling; he went right in after her as quick as she went in; I did not know exactly where the pistol was fired, but *I thought it was fired in the direction of* the house or over that way. I was not certain, and I looked over in the yard and I did not see anybody in the yard, so I went to go out the back way and look in the gate, and I seen everybody going along coming to that yard, and I turned round and went to the back up there and the gate was locked. *It was about three or four minutes after defendant went into the room or house that I heard the pistol shot*; *I saw no one come down and enter the back yard from the house after the young lady went in.*"

*Mat Boldridge* testified that he was a barber. His shop was located directly east of and adjoining the Bauerle house. A fence separated his lot from the Bauerle yard. There is a porch back of his building and one back of the Bauerle building, about ten feet from the ground. He says: "Amelia Bauerle was killed on Sunday morning. I heard a pistol shot that morning about 9 o'clock; I was down in the barber shop. Just before that I heard a rumbling upstairs, and *I thought it was my boys fighting and I grabbed up my rawhide and ran upstairs.* Just after I heard that

rumbling I heard the pistol shot, or about the same time. I then looked at once over the Bauerle back fence and I saw Mr. John Bauerle and the ladies belonging to the house, Mrs. Bauerle and Mrs. Moore and Mrs. Bauerle again. A man by the name of Davis from Oklahoma was with me and he got over the back fence and went over there and I went around to the gate and up the steps behind him. He was just a few feet ahead of me when he went into the house. From the time I heard the pistol shot to the time I was in the house was about two minutes and a half, and in the room I found Mrs. John Bauerle and Mr. John Bauerle and the old lady Bauerle and this man Davis and myself and the girl lying on the floor. All I heard the girl say was to tell Dr. Fulkerson not to go to cutting on her. I remained there until she began to die. It was four or five minutes before Dr. Fulkerson got there. The defendant, Otto Bauerle, came in just before the doctor did. The defendant came around to the girl's head and took hold of her head. Dr. Fulkerson asked, 'What did she do it with?' and the young man reached up in the window and says, 'Here's what she did it with,' and that is the only time I saw the pistol and the last time. About this time Mr. Clark and Mr. Dickerson and a whole drove of other people came in."

*Victor Dickerson:* This shooting occurred one Sunday morning. I was standing on the corner of Main street when I heard the shot, and I went to Mr. Bauerle's house with Mr. Clark and Mr. Otto Bauerle, defendant. Dr. Fulkerson was with the defendant, I close behind. I found the girl lying on the floor. There was in the room Mr. John Bauerle and his wife, Mr. Moore and his wife, defendant's mother, Mr. Davis, Mr. Boldridge and the girl. I picked up a revolver or pistol that was lying on the floor and laid

it in the window and then we picked the girl up and laid her in the front room. She lived some twenty-five or thirty minutes. I only heard her say, "Turn me over." Mr. Clark and I were standing on the corner at the time Mr. Bauerle came up. It was between 9 and 10 o'clock in the morning. Where we were standing is about five or six buildings from the Bauerle building. I saw defendant Bauerle cross the street and run over to Dr. Fulkerson's drug store. When he came back he told us that the girl had hurt herself or something of that sort. Mr. Clark, myself, and defendant went right on up Main street on the south side to the Bauerle building and into a hallway that goes up stairs. We went up stairs and walked back to the back room; Mr. Clark was before me.

*George Clark:* I remember the shooting of Miss Amelia Bauerle on one Sunday morning. I was standing on the corner with Mr. Dickerson and went from there to the place where she was shot with Mr. Dickerson and Mr. Otto Bauerle, the defendant. When I got to the room I found Mr. Boldridge and a stranger there. The girl was lying on the floor; Dr. Fulkerson came in and asked me to cut her clothes open, and I unbuttoned her wrapper and cut her corset off. I think this is the corset. The first words she said were, "Oh, I am so sick," and then commenced vomiting a little, and then said, "Don't cut me." Then when we laid her on the bed she said, "Turn me over." I was there possibly ten minutes and she was not dead when I left. I seen the pistol just as Mr. Dickerson picked it up off of the floor.

*Phillip Craig:* At the time of the shooting I was living in Lexington. The shooting happened one Sunday morning, between 9 and 10 o'clock. I was within two or three blocks of the building when it happened. I saw the defendant Bauerle that day,

down in front of the building. I asked him something about the shooting and he told me that this lady, the deceased, had shot herself, and I asked him if there was anything the matter with her, if she was troubled or anything that way, and he said, no, sir; that he did not think she was, that she appeared to be in good spirits and jovial. Defendant further stated that he was in bed, I think, and that the deceased came into the room and asked him if he wanted to change his clothing, and if he was going to get up, and that she went out and came back with his underclothes, and that he got up and changed and started down stairs, and then he spoke about the pistol and the arrangements in the room; he said, there is a certain table sitting in the room, and his father's pistol and his razor was lying on that center table. He said they were in the room where he slept, and he said as he went down stairs he heard the pistol shot, and he went back, and this lady was standing by the bed very pale looking, and he put his arm around her and laid her on the bed. I knew Bauerle when I saw him, he was talking directly to me. I went to him and asked how it occurred; what caused it.

*Zack W. Wright:* In 1896 I was sheriff of this county. I remember the shooting of Amelia Bauerle. I was informed of the shooting about ten minutes after it happened, and I went to the room where the shooting had been done. Mr. Bauerle and defendant Bauerle were in the room, and the ladies about the place, Mrs. John Bauerle and Mrs. Moore, and I believe, Mr. Moore, *Misner* and Dr. Fulkerson were there. She was very near dead when I got there. I had the pistol in my hand and examined it at the time, but I did not bring it away with me. I do not think I ever got the pistol. The old gentlemen, Mr. Bauerle, said it was his pistol, that I could examine it, but he refused

to let it be taken off the place, and he said it was in the other room where he always kept it, and he went and showed me where.

*J. M. Crowder:* I remember hearing of this shooting; I was in the east end of town; I saw Otto Bauerle, the defendant, the Saturday evening before the shooting. Late that night I saw Amelia Bauerle, the deceased, down on Franklin street; she was with George Menaugh when I saw her; she was going home when I saw her the last time; she was with George Menaugh. *Menaugh* testified that he was with deceased Saturday till perhaps 11 o'clock and she was cheerful and apparently happy. Another witness saw her Sunday morning as she returned from market. She dropped her hat and he picked it up and handed it to her and she smiled and thanked him.

The defense was that deceased committed suicide. *Mrs. John Bauerle* testified that she reached her soon after she was shot and asked her how she was shot and she said she shot herself. *John Bauerle* also testified that he and his wife heard the shot and went at once and found her on the floor and the pistol lying there and she said she shot herself. No other witness however heard deceased make such a statement, though Mrs. John Bauerle says there were a dozen in the room at the time, and she spoke loud enough for them to hear her. *Mr. Crenshaw*, a druggist, testified he knew deceased; that a few days before her death she came to his drug store for morphine. He didn't know for whom she bought it and did not say what quantity she obtained.

Several witnesses were called to testify as to the general character of James Misner for truth and veracity and they stated his reputation was bad in that regard. Several other witnesses testified to seeing defendant in the yard soon after the shot was fired coming

hurriedly from the water-closet. Witness *Menaugh* also says he heard the conversation detailed by witness Craig and says that defendant said that he had been out in the yard and when he heard the shot, ran into the house and found Amelia standing there very pale. He laid her down but couldn't remember whether he said he laid her on the floor or the bed. Boldridge testified he did not hear Mrs. Bauerle ask Amelia who shot her. There was also evidence tending to show that the young woman was addicted to going out at night by herself and that her father often went after her and brought her home.

I. It may be stated in the outset that this homicide presents some very unusual features. If the defendant is guilty as the jury by their verdict asserts he is, it was a most unnatural crime. The defendant was the uncle of the deceased. She was a brother's daughter under the care and protection of his father and naturally and justly was entitled to look to defendant also as her protector. They were members of the same family, living under the same roof. The record does not disclose to us some facts which the jury probably observed. The age of the defendant does not appear in the proofs and we have none of his personal characteristics in evidence. Whether the intimacy which the record discloses was a natural and legitimate one, springing from the ties of blood between uncle and niece, or grew out of unnatural relations, we can not know nor surmise. The jury may have drawn some inferences which we can not. On the other hand the great preponderance of the evidence shows no motive whatever for suicide. The deceased was apparently happy and cheerful on the evening prior and the morning of her death. Various grounds for reversal are urged and the nature of the charge and the earnestness of the counsel challenge a most careful investigation. The indictment was

in the approved form.     The arraignment was  regular.

Only one juror was challenged and this brings us to a consideration of the first exception in the trial. It is charged that the court erred in excusing H. F. Kleinschmidt from the panel of forty. It is not insisted that the panel of forty finally obtained were not entirely qualified but that the defendant was entitled to have Kleinschmidt retained on the panel.     The juror was informed that the State expected to substantiate the charge in the indictment by circumstantial evidence, and was asked by the prosecuting attorney if his opinions were such as to preclude his finding the defendant guilty *upon circumstantial evidence alone*, in a case where the punishment would be death.   He answered he was opposed to capital punishment on circumstantial evidence.     Upon further examination and cross-examination he still asserted that he was opposed to capital punishment on circumstantial evidence, but there might be an exceptional case where he could do so, but as a general proposition he would not convict on that character of evidence.     Being pressed to say that if the evidence convinced him of defendant's guilt beyond a reasonable doubt, whether he could or would not convict, he answered ''Well, I believe I could, but I would have to admit it would take a great deal of it and would have to be very strong.''     Upon this showing the court excused him.     This juror was in the presence of the court.     It observed his manner, and probably living in the same county he was known to the judge, and a wise discretion was necessarily lodged with the judge in excusing him.     Whether the juror stood indifferent between the State and the defendant was a fact which the court under our laws was required to determine and his finding will not be disturbed unless manifest error appears.     *State v. Williamson*, 106 Mo. 162.     We think the court very properly excused the juror, even from

what appears to us.    There is no reason why the State should have had the additional burden of satisfying all the whims of this juror.

II.   The court instructed the jury that there was no direct evidence of defendant's guilt, and then instructed them of its own motion as follows on circumstantial evidence:

"3.    Evidence is of two kinds, direct and circumstantial.    Direct evidence is when a witness testifies directly of his own knowledge of the main fact or facts to be proven.    Circumstantial evidence is proof of certain facts and circumstances in a certain case from which the jury may infer other and connected facts which usually and reasonably follow, according to the common experience of mankind.    Crime may be proven by circumstantial evidence, as well as by direct testimony of eyewitnesses; but the facts and circumstances in evidence should be consistent with each other and with the guilt of defendant, and inconsistent with any reasonable theory of defendant's innocence."

For the defendant it gave the following:

"3.    The court instructs the jury that the guilt of defendant can not be presumed, but must be proven either by direct or circumstantial evidence, and the court instructs you that there is no direct evidence of the guilt of the defendant in this case.    Before you can convict the defendant on circumstantial evidence alone, the facts and circumstances must all form a complete chain, and all point to his guilt, and must be irreconcilable with any reasonable theory of his innocence, and before the jury can convict the defendant on circumstantial evidence alone, the circumstances must not only be consistent with his guilt and point directly thereto, but must be absolutely inconsistent with any unreasonable theory of his innocence.

"4. The court instructs the jury that circumstantial evidence should always be cautiously considered, and to warrant a conviction it must be such as to produce in the minds of the jury that certainty of guilt that a discreet man would be willing to act upon in his own grave and important concerns. Such evidence is not sufficient for conviction unless it excludes every reasonable theory consistent with the defendant's innocence. If the jury are not satisfied of the guilt of the defendant beyond a reasonable doubt, the defendant ought to be acquitted, although the unfavorable circumstances, if any, have not been disproven or explained."

That these instructions were in perfect harmony and as favorable as the law would justify does not admit of argument. Certainly defendant has no reason to complain of the burden placed upon the State. The point made by the learned counsel that they are in conflict can not be sustained.

III. The court gave ample instructions of its own motion, but the defendant requested ten prepared by his counsel, and of these the court gave eight and refused two. One of those refused had been given in full by the court in its own instruction as to the credibility of witnesses. The ninth was properly refused because it assumed that the only evidence of the commission of a crime was that deceased came to her death suddenly. The court had already instructed the jury in the fullest manner that unless they found and believed from the evidence beyond a reasonable doubt that defendant had shot and killed deceased willfully, premeditatedly, deliberately and of his malice aforethought they must acquit him, but in addition to that the court had instructed the jury that if they believed deceased committed suicide they would acquit defendant; that if the State had shown no motive on the part of defendant to

commit the crime charged, then the absence of such motive was a circumstance which the jury ought to consider. It also instructed them that if they had a reasonable doubt as to whether Otto, the defendant, was in the room at the time of the firing of the shot they would acquit him, and also gave the following on the burden of proof: "The court instructs the jury that the burden of proof to establish the guilt of the defendant devolves upon the State throughout the entire trial, and that the law clothes the defendant with the presumption of innocence which attends and protects him until overcome by competent evidence, which proves his guilt to your satisfaction beyond a reasonable doubt. It is not sufficient in this case that there may be a suspicion, or possibility or probability of his guilt, nor can his guilt be arrived at by guessing or by compromise, but the testimony must be of such a nature that when you have considered it all, you find a clear and abiding conviction of the guilt of the defendant beyond a reasonable doubt. This much is required by the law; if this much has not been proven, you will acquit the defendant."

No further instructions could have aided the jury, and no error was committed in refusing them, however correct they might have been, abstractly considered.

IV. The court gave the following instruction:

"The court instructs the jury that if you believe and find from the evidence in this cause, beyond a reasonable doubt, that the defendant, at the county of Lafayette and State of Missiouri, on or about the 26th day of April, 1896, willfully, premeditatedly and of his malice aforethought shot and killed one Amelia Bauerle, but without deliberation, you will find the defendant guilty of murder in the second degree and will assess his punishment at imprisonment in the penitentiary for a term of not less than ten years."

It had already defined the meaning of deliberation, premeditation and malice aforethought. Defendant insists that this instruction is misleading and should not have been given. It is sufficient to say that this instruction has been approved a score of times by this court, and is the settled law of this State. *State v. Moxley*, 115 Mo. 644; *State v. Moxley*, 102 Mo. 374.

V.   But it is evident that the learned counsel for defendant bases his right to a reversal upon two grounds: *First*, conceding the truth of all the testimony, still the admitted circumstances are insufficient to sustain a conviction, and, *secondly*, that though the evidence was sufficient if true to justify a verdict, that evidence was so thoroughly impeached that it must be disregarded by this court as unworthy of credence. Regarding the first of these propositions as the most important in this case, let us see upon what the verdict rests.   Upon a charge of murder, the State produced evidence tending to prove that on the Saturday previous to the shooting next morning the defendant and deceased were seen together in the alley in the rear of their residence.   Deceased had gone in search of defendant, and as they returned defendant had the appearance of being very angry and as they passed the witness, defendant said to deceased "I'll soon get rid of you."   The evidence also tended to prove that on the same day deceased had stood at the back gate and conversed with a negro man named Vinegar; that defendant came up, and either pulled or compelled deceased to go in, and reproved the negro for having the impudence to talk to a white woman.   Sunday morning about nine o'clock the defendant was sitting upon the back porch of the Bauerle residence, the home of deceased and himself, apparently cleaning or loading a pistol, and while thus engaged the deceased came upon the porch, and a conversation occurred

which could not be heard by the witness, but which led to a scuffle between deceased and defendant, and she was heard to call him a liar, and seen to retreat into the house, and the defendant immediately hurried after her. Soon after passing out of view a barber, whose shop was on the ground floor in the adjoining building, heard a rumbling up stairs which he took to be his own boys fighting, and so impressed was he with the nature of the difficulty that he seized a rawhide whip and started up stairs to quell it, the fighting, when he heard something like a shot or something thrown suddenly against the side of the house; this shot was heard by the witness who saw the two run into the house from the porch, and the brother of defendant and his wife and several others in the neighborhood, John Bauerle and his wife and Boldridge, the barber, ran at once up stairs and found Amelia, the deceased, lying on the floor shot in the stomach. The defendant was not there when they came into the room. He had gone for Dr. Fulkerson and had sent him in a great hurry. The evidence discloses that defendant was the first person who reached the deceased after she was shot. According to his statements to other witnesses he rushed into the room and found her standing up and looking very pale; that he laid her upon the bed and went after Dr. Fulkerson. There is positive evidence he was not in the room when his brother and his wife and Boldridge reached her. There is no evidence that he called any of the family to assist him in caring for or to look after deceased during his absence summoning the physician. After Dr. Fulkerson reached the house, Boldridge testified he inquired "What did she do it with?" And the defendant reached up in the window and took down a pistol and said "Here's what she done it with."

There was ample evidence to justify the jury in finding the defendant was in the room at the time the fatal shot was fired.  His own unqualified statement to the physician indicated absolute knowledge of the shooting; besides, we have the evidence of other witnesses who saw him follow deceased into the house only a moment before the report of the pistol was heard, and of others that he was not seen to leave the house, and his own statement that after dressing he was in the act of leaving the house when he heard the shot.  The defendant made contradictory statements as to his whereabouts and attempted to show an *alibi*. We have as proof of the *corpus delicti* the dead body of Amelia Bauerle.  Absolute and conclusive evidence that the cause of her death was a pistol shot from a revolver found in the room.  The testimony of witnesses that heard the report of the shot that killed her; evidence that immediately before that shot was heard deceased was seen in a scuffle with defendant who held a revolver in his hand; that she was heard to apply the epithet of *liar* to defendant, and a hasty retreat by deceased within the house, quickly followed by defendant, sounds of a struggle *within* so pronounced as to cause the barber to regard it as a fight between his boys, and that struggle suddenly ended by the sharp and sudden report of a pistol shot; the hurried departure of defendant for the surgeon, his contradictory statements of his whereabouts when the shot was fired, his unsupported statement that he laid her on the bed. The evidence disclosed that there was only one pistol in those rooms, and with that deceased was killed. Defendant had a pistol in his hands when he and deceased were scuffling on the porch and no proof was offered by defendant to show that his revolver had not been discharged.  Again there was a fierce struggle in the room in which deceased was killed, and there is

not the slightest suggestion that any person other than deceased was in that room who could have, or did, engage in the struggle heard by the barber in the room below.

To the suggestion of suicide the jury might have well responded that the finding of the pistol on the floor was inconclusive. It could have been thrown there by defendant as easily as by deceased. The powder burns on her clothing demonstrated that the pistol was near her body when fired, but it was plain that in a personal struggle her assailant was also very near to her. While the law presumes the defendant innocent, there is also a strong presumption against suicide, and while this presumption does not overcome the presumption of innocence the jury as rational men are not expected to disregard it.

Finally, we have the case of a man struggling with a young woman. He is shown by positive evidence to have had a pistol in his hands when the difficulty begins; there is no evidence that she ever had a pistol in her possession save that it was found in the room where she was found wounded and helpless. Were the jury to infer that a young woman apparently happy and with no motive for self-destruction, wrenched that revolver from the man with whom she was struggling, and shot herself or were they justifiable in finding that the revolver *remained* in the hands where last seen; that the struggle was not an amicable one from the character of the epithet she had applied to him, and that being naturally the stronger, he had kept the pistol in his hands, and by his criminal agency it was fired at her, and produced her death in pursuance of the threat of the day previous to get rid of her? Were the jury not justified in believing that there was something unnatural in her uncle rushing off and leaving her dying without summoning her other relations in the same house? If

there were any of the ordinary expressions of grief, any symptoms of affection, shown over her body, no evidence of them have been preserved. Indeed there is something pathetic in the utter absence of those tokens of grief that ordinarily attend the tragic death of a member of the family. We think the jury were justified in finding that defendant shot and killed Amelia Bauerle, and when it appeared that he shot her with a deadly weapon in a vital part, the law presumes the malice necessary to make it murder in the second degree in the absence of any and all palliating circumstances. Of course we can not know, beyond the peradventure of a doubt, all the details of this killing, but we are not on that account to reject those natural presumptions and conclusions which reasonable men indulge every day in the affairs of life. That there was proof of the *corpus delicti* can not be doubted if the evidence was to be believed.

This brings us to the contention of the learned counsel for defendant that this court should reject *in toto* the evidence of the negro man, Misuer. To do so this court must invade the province not only of the trial jury who heard this man testify, observed his demeanor, and were far more capable of correctly weighing his evidence than this court can possibly be, but we must override the opinion of the learned judge of the criminal court, who also heard his testimony. Upon what grounds are we to do this? Upon the assertion of others who, after the trial, make affidavits that his testimony was false? Here again, it must be remembered the trial judge who passed upon these impeaching affidavits lived in Lexington where the impeaching witnesses also lived, and by his finding, he virtually certifies that in his opinion their evidence did not justify him in granting a new trial. But there is another most potent consideration. This record does not disclose any interest that Misner had which would lead

him to commit perjury. He gave his evidence at the coroner's inquest and on the trial. He had lived in Lexington all his life and while his general reputation for truth and veracity was impugned, still as to this case it appears he occupied a disinterested, independent position, and when this is so the fact that a witness may have been impeached generally will not so completely destroy his evidence that a court or jury is bound to reject it if in their opinion it corresponds with the truth and is consistent with the controlling facts of the case. "So far does this principle extend," says Starkie in his Treatise on Evidence [10 Am. Ed.], 829, "that in many cases, except for the purpose of repelling the suspicion of fraud and concert, the credit of the witnesses themselves for honesty and veracity may become wholly immaterial. Where it is once established that the witnesses to a transaction are not acting in concert, then, although individually they should be unworthy of credit, yet if the coincidences in their testimony be too numerous to be attributed to mere accident, they can not be explained on any other supposition than their truth." That Misner's business called him to the saloon near by to wash it out on that morning is conceded. Swartz, the barkeeper, in his affidavit says Misner had finished his work and gone two hours before the killing. That Misner was in the room, where the dying girl was, before she died, is testified by Mr. Zach Wright, the sheriff of the county. While the jury could not consider the failure of the defendant to testify, this court, in considering the grounds urged upon a motion for new trial, can not ignore the fact that the defendant was a competent witness in his own behalf, and he knew what Misner would testify in substance long before the trial, and yet he declined to take the stand and deny that he and deceased were on that porch a few moments before the shot was fired, and he could

have informed his counsel if any illwill existed between Misner and himself, and upon cross-examination shown that fact to the jury. We have no doubt whatever that the character of this witness and his testimony were fully ventilated before the jury and yet the jury believed it, and it must have borne upon its face such evidence of *undesignedness and general harmony with the other evidence* that they felt they had no right to reject it, although permitted so to do by the court, and we have no disposition to substitute our estimate of it for theirs.

It remains only to examine the motion for new trial on the ground of newly discovered evidence. The affidavits of Kirk Wilson and Mary Wilson simply relate conversations with deceased as to her intention to commit suicide and show that their said evidence would be incompetent and inadmissible on a new trial. Amelia Bauerle was not a party to the record and these statements being neither a part of the *res gestae*, nor *dying declarations* would be clearly inadmissible. *McMillen v. State*, 13 Mo. 31; *State v. Nocton*, 121 Mo. 537; *State v. Punshon*, 124 Mo. 457. And her supposed threats, being unaccompanied by any attempt to carry them into execution, were equally incompetent on that ground. *State v. Fitzgerald*, 130 Mo. 407.

The affidavits of Williams and Johnson simply impeach Misner's testimony given on the trial and as such are no grounds for new trial, besides being flatly contradicted by the affidavit of the barkeeper at Samuelson's saloon. The affidavit of Gates is alike insufficient for the same reason to justify a court in granting a new trial on the ground of newly discovered evidence.

Upon a full review of the case we find no reversible error in the record and the judgment of the criminal court of Lafayette county is affirmed. SHERWOOD and BURGESS, JJ., concur.