## El Pueblo, Demandante y Apelado, *v.* Concepción, Acusado y Apelante.

## Apelación procedente de la Corte de Distrito de San Juan, Sección 2ª., en causa por asesinato en primer grado.

No. 662.—Resuelto en julio 31, 1914.

Asesinato en Primer Grado—Pena Capital—Apelación de Oficio—Necesidad de que el Acusado Interponga la Apelación.—Los preceptos de la sección 1ª. de la Ley No. 10 de marzo 9, 1911, demuestran que la Legislatura consideró esencial para que existiera apelación en un caso de asesinato en primer grado castigado con pena capital, el que aquélla se interpusiera, y no fué su intención el que dichos casos quedasen apelados de oficio para ante el Tribunal Supremo por el mero hecho de ser casos de asesinato en primer grado castigados con pena capital.

Id.—Jurisdicción del Tribunal Supremo—Apelación de Oficio—Omisión de Interponer la Apelación.—Para que el Tribunal Supremo adquiera jurisdicción en grado de apelación en un caso de asesinato en primer grado castigado con pena capital, es indispensable que el acusado o su abogado interponga dicha apelación.

Id.—Derogaciones Tácitas—Interpretación en Caso de Duda.—Las derogaciones tácitas no son favorecidas por la ley y cualquier duda debe resolverse en contra de la intención de cambiar la ley y el procedimiento constante de varios años.

Id.—Apelaciones en Casos Criminales.—Los preceptos de la Ley No. 10 de marzo 9, 1911, no han derogado el artículo 347 del Código de Enjuiciamiento Criminal relativo a las resoluciones apelables en casos criminales.

Apelación—Abogados—Apelación Contra la Voluntad del Cliente.—Para que exista una apelación es necesario que se manifieste la voluntad de la parte de apelar, y aun cuando una ley dispusiera lo contrario, un abogado, cumpliendo con el deber de ajustarse a las instrucciones de su cliente, no tendría el derecho de apelar contra la voluntad de aquél.

Asesinato en Primer Grado—Apelación en Casos de Pena Capital—Objeto de la Ley No. 10 de Marzo 9, 1911.—El objeto de esta ley no ha sido otro que el de imponer al abogado del acusado el deber de establecer apelación en causas de pena capital y el de que, para resolverlas, esta Corte Suprema tenga siempre ante sí una relación de la prueba presentada al jurado, ya preparada por el abogado o en su defecto por el juez que presidió el juicio.

Los hechos están expresados en la opinión.

Abogado del Pueblo: *Sr. Charles E. Foote, Fiscal.*

Abogado del apelante: *Sr. José de J. Tizol.*

El Juez Asociado Sr. Wolf, emitió la opinión del tribunal.

La cuestión a resolver en este caso es si un caso de pena capital queda de oficio transferido a la Corte Suprema de Puerto Rico en grado de apelación por efecto de la Ley No. 10 de marzo 9, 1911, que estatuye lo siguiente:

"Sección 1ª.—En toda causa en que se hubiere pronunciado sentencia de muerte por una corte de distrito, será el deber del abogado o abogados del acusado apelar debidamente dicha causa para ante el Tribunal Supremo de Puerto Rico.

"Sección 2ª.—En todas esas causas en las cuales el abogado del acusado no haya hecho preparar el récord en debida forma para trasmitirlo al Tribunal Supremo según se dispone anteriormente, dentro del tiempo que la ley prescribe, el secretario de la corte de distrito notificará el hecho al juez del distrito, y será entonces el deber de dicho juez, en los treinta días subsiguientes, preparar y certificar una relación de la prueba presentada al jurado en la forma que le sea más conveniente, y dicho juez de distrito queda autorizado para prorrogar el tiempo en el cual deba el secretario enviar la transcripción del récord al Tribunal Supremo en cumplimiento de las disposiciones de esta ley.

"Sección 3ª.—Toda ley o parte de ley que se opusiere a la presente queda por ésta derogada."

Leyes de 1911, p. 70.

Como puede verse, la sección 1ª. impone al abogado o abogados el deber de "apelar debidamente" para ante la Corte Suprema de Puerto Rico. Por tanto, la Legislatura consideró como esencial para una apelación el que ésta se interpusiera, y si ésta ha de interponerse resulta que no ha existido la intención por parte de la Legislatura de que los casos de pena de muerte queden de oficio apelados para ante la Corte Suprema. En otros términos, si el caso quedara de oficio transferido por el mero hecho de ser un caso de pena capital, no existiría la necesidad de imponer al abogado el deber de apelar.

La sección 2ª. presupone que se ha interpuesto la apelación y elevado el caso a la Corte Suprema de Puerto Rico. Sus palabras se refieren a la omisión por parte del abogado, no de interponer la apelación sino de preparar el récord para

elevarlo a este tribunal.  Dicha sección parte del supuesto
de que la jurisdicción sobre el caso ha sido ya adquirida por
la Corte Suprema de Puerto Rico, mediante la apelación por
el abogado.  Por tanto, cuando el abogado deja de preparar
el récord, habiendo ya sido transferida la jurisdicción a esta
corte, entonces el juez tiene el deber, mediante previo aviso,
de preparar una "relación de la prueba presentada al ju-
rado."  El juez queda autorizado para prorrogar el tiempo
para que se eleve el récord en debida forma, y es de supo-
nerse que la exposición del caso que ha de preparar el juez
puede agregarse al legajo de la sentencia que se prepare
de acuerdo con los preceptos del artículo 356 del Código de
Enjuiciamiento Criminal, enmendado por la Ley de marzo
7, 1908, página 56.  La sección 2ª. se refiere únicamente a la
preparación de la exposición del caso y a su incorporación
en la transcripción de autos.  No trata de la adquisición por
este tribunal de jurisdicción.  Las palabras "según se dis-
pone anteriormente" son anómalas porque el deber de ape-
lar no incluye el deber de preparar el récord.  Tal vez su
única explicación es el uso de las palabras "apelar debida-
mente."  La Legislatura en la primera sección, puede haber
tenido la intención de que la palabra "debidamente" se apli-
que también a la preparación del récord.  Entonces el deber
de los abogados sería no sólo de apelar sino también de pre-
parar el récord, y las palabras "según se dispone anterior-
mente" serían explicables.  De otra manera no son sino su-
perfluas.

Pero hay otras consideraciones de carácter general.  El
artículo 345 del Código de Enjuiciamiento Criminal, enmen-
dado por Ley de febrero 6, 1904, dispone que cualquiera de
las partes puede apelar para ante la Corte Suprema siempre
que la apelación verse sobre una cuestión de derecho según
queda prescrito en este capítulo.

El artículo 347 dispone que el acusado puede apelar (1)
de una sentencia condenatoria definitiva, (2) de una orden
denegando una moción de nuevo juicio, (3) de una orden dic-

tada después de sentencia y que afecte los derechos sustanciales de la parte. Estos constituyen todos los preceptos legales anteriores a marzo 9, 1911, en virtud de los cuales un acusado podía apelar para ante la Corte Suprema. En la Ley de marzo 9, 1911, no hay la más mínima palabra que se refiera a estos artículos o que demuestre una intención directa de modificarlos o enmendarlos. Las derogaciones tácitas no son favorecidas por la ley y cualquiera duda debe resolverse en contra de la intención de cambiar la ley y el procedimiento constante de varios años.

En todas partes es necesario que la voluntad de la parte de apelar se revele. El principal deber de un abogado es ajustarse a las instrucciones de su cliente, y a pesar de las palabras de la ley en sentido contrario no creemos que un abogado tenga el derecho de apelar contra la voluntad de su cliente. No hay precepto alguno en la ley que fije el momento en que quedaría el caso elevado si se sostuviera que el caso queda de oficio transferido. ¿Queda el caso elevado instantáneamente a la Corte Suprema al decretarse la sentencia o cuándo el abogado deja de apelar? ¿Cuándo empieza a correr el tiempo para preparar la transcripción de autos y por qué se hace necesario prorrogar el término según dispone la sección 2ª., si el caso no ha de regirse por las reglas aplicables a todo otro caso criminal y exige la intervención de la parte o de su abogado?

En el caso de autos el juez preparó la exposición del caso y el secretario elevó la transcripción de autos pero no se interpuso apelación. De aquí que este tribunal nunca adquirió jurisdicción y no tenemos autoridad para examinar los méritos de las alegaciones ni del juicio.

El objeto de esa ley no ha sido otro que el de imponer al abogado el deber de establecer apelación en causas de pena capital y el de que para resolverlas esta Corte Suprema tenga siempre ante sí una relación de la prueba presentada al jurado, ya preparada por el abogado o en su defecto por el juez que presidió el juicio, evitando de este modo que, cual

ha ocurrido en muchos anteriormente por falta de esa rela-
ción de hechos, tuviéramos que limitar nuestra consideración
en el caso a determinar si la acusación era suficiente y si las
instrucciones del juez al jurado eran correctas. El caso debe
ser desestimado o archivado por falta de apelación.

*Sobreseída la apelación y archivada la transcripción.*

Jueces concurrentes: Sres. Presidente Hernández y Aso-
ciado Aldrey.

Los Jueces Asociados Sres. del Toro y Hutchison disin-
tieron.

OPINIÓN DISIDENTE DEL JUEZ ASOCIADO SR. DEL TORO CON LA CUAL
ESTÁ CONFORME EL JUEZ ASOCIADO SR. HUTCHISON.

La presente es una causa criminal en la cual se impuso
al acusado la pena de muerte. El Fiscal de la Corte de Dis-
trito de San Juan, Sección 2ª., imputó a Mateo Concepción
el delito de asesinato en primer grado, cometido en la per-
sona de Serafina Dones, en la madrugada del 8 de septiembre
de 1912, dentro de esta ciudad de San Juan. El acusado
hizo la alegación de no culpable. El juicio se celebró ante
un jurado. Este, el 16 de enero de 1913, rindió su veredicto
declarando a Concepción culpable del delito de asesinato en
primer grado. El convicto, por medio de su abogado, solicitó
un nuevo juicio. La corte negó la solicitud, y, el 11 de febrero
de 1913, dictó sentencia condenando a muerte a Mateo Con-
ceepción, el acusado.

La primera cuestión que debemos considerar, es la de si
tenemos o no tenemos jurisdición para intervenir en esta
causa.

Examinada la transcripción del récord, no aparece incluído
en ella ningún escrito de apelación contra la sentencia ni
contra la resolución denegatoria de nuevo juicio, existiendo
una constancia puesta por el secretario del tribunal senten-
ciador, que dice así: "Escrito de apelación. El abogado del

acusado no presentó escrito de apelación por tratarse de un asesinato en primer grado.'' La exposición del caso fué preparada por el propio juez sentenciador, quien expresó que lo hacía ''en cumplimiento de la sección 2 de la ley aprobada en 9 de marzo de 1911, y para los efectos de la apelación.''

Elevada la transcripción a esta Corte Suprema, el abogado del acusado faltó en presentar su alegato, no obstante haber solicitado y obtenido prórroga para ello, y señalado el 29 de mayo de 1914 para la vista, no compareció el dicho abogado limitándose a pedir por teléfono la suspensión del acto por causa de enfermedad.

En el año de 1902 se instauró en Puerto Rico un nuevo sistema penal, poniéndose en vigor un Código Penal y otro de Enjuiciamiento Criminal.

En dicho sistema, las sentencias dictadas por las cortes de distrito, con o sin intervención del jurado, resuelven definitivamente las causas criminales y son ejecutorias desde el momento en que se dictan, a menos que se entable contra ellas recurso de apelación.

La materia de apelaciones está regulada por los artículos 345 al 369 del Código de Enjuiciamiento Criminal, algunos de los cuales han sido enmendados por leyes posteriores de la Asamblea Legislativa. Secs. 6383 to 6415 of the Revised Statutes and Codes of Porto Rico.

En 1902 no existía más distinción entre las apelaciones interpuestas en casos de pena de muerte, y las establecidas en los demás casos, que la referente a la suspensión de la ejecución de la sentencia. De acuerdo con el artículo 353, en los de pena de muerte la apelación suspendía acto seguido la ejecución del fallo, y en los demás casos la ejecución se suspendía ''al presentarse al secretario del tribunal sentenciador una certificación del juez de dicho tribunal o de un magistrado de la Corte Suprema, manifestando que en su opinión existen causas probables para la apelación.''

En 1903, Leyes de 1903, página 46, se decretó en general que ''una apelación ante la Corte Suprema, de una sentencia

condenatoria, suspende la ejecución de la misma," quedando así derogado implícitamente el precepto del artículo 353 relativo a la certificación que se debía presentar para obtener la suspensión de la ejecución de la sentencia.

En 1911 se aprobó la ley No. 10 respecto a apelaciones en causas capitales. Dicha ley contiene solo tres secciones que, copiadas a la letra, dicen así:

"Sección 1.—En toda causa en que se hubiere pronunciado sentencia de muerte por una corte de Distrito, será el deber del abogado o abogados del acusado apelar debidamente dicha causa para ante el Tribunal Supremo de Puerto Rico.

"Sección 2.—En todas esas causas en las cuales el abogado del acusado no haya hecho preparar el récord en debida forma para trasmitirlo al Tribunal Supremo según se dispone anteriormente, dentro del tiempo que la ley prescribe, el secretario de la corte de distrito notificará el hecho al juez del distrito, y será entonces el deber de dicho juez, en los treinta días subsiguientes, preparar y certificar una relación de la prueba presentada al jurado en la forma que le sea más conveniente, y dicho juez de distrito queda autorizado para prorrogar el tiempo en el cual deba el secretario enviar la transcripción del récord al Tribunal Supremo en cumplimiento de las disposiciones de esta ley.

"Sección 3.—Toda ley o parte de ley que se opusiere a la presente queda por ésta derogada."

Leyes de 1911, p. 70.

¿Cuál es el alcance de la ley que hemos transcrito? ¿Establece una apelación de oficio en todos los casos de pena de muerte, o se limita a imponer el deber de apelar al abogado del acusado, y sólo cuando el abogado cumple con ese deber es que confiere jurisdicción a la Corte Suprema?

A nuestro juicio no puede negarse que la ley No. 10 de 1911 introdujo una variación en el sistema penal vigente desde 1902, estableciendo una diferencia en la materia de apelaciones entre los casos de pena de muerte y todos los demás. Por su sección 1 impuso al abogado del acusado el deber de apelar, y por su sección 2 previó el caso en que dicho abogado dejara de cumplir con su deber y dispuso que entonces sería

la obligación del juez sentenciador "preparar y certificar una relación de la prueba presentada al jurado en la forma que le sea más conveniente," quedando encomendada al secretario la misión de elevar la transcripción del récord al Tribunal Supremo.

Siendo esto así, opinamos que nuestra jurisdicción es clara, y, en tal virtud, procederemos al estudio y resolución de las cuestiones envueltas, no sin antes expresar que censuramos la conducta seguida por el o los abogados del acusado, tanto en la corte inferior como en esta Corte Suprema.

De la transcripción aparece que el acusado solicitó de la corte sentenciadora la celebración de un nuevo juicio basándose en que se habían cometido los siguientes errores:

1. El veredicto rendido no es la expresión imparcial de todos los jurados;

2. El jurado fué constituído erróneamente;

3. El jurado Fernández Mascaró fué recusado sin motivo;

4. Se negó ilegalmente al acusado la facultad de recusar perentoriamente a algunos jurados;

5. Se instruyó erróneamente al jurado sobre la fuerza probatoria de la testigo Amparo Zeno;

6. La instrucción sobre "circunstancias atenuantes" es contradictoria y perjudicial al acusado, y

7. El veredicto es contrario a la ley y a la prueba.

Veamos si dichos errores se cometieron o no por la corte de distrito.

1. Cuando los jurados regresaron al tribunal con su veredicto, se comenzó a preguntarles individualmente si el rendido era en verdad su veredicto y entonces el jurado Aníbal Herrera preguntó a la corte si podía excusársele de dar la contestación requerida. La corte le informó que nó y acto seguido el jurado contestó que el entregado era su veredicto. No podemos convenir con el acusado en que del hecho anteriormente descrito pueda derivarse la consecuencia de que el veredicto no fué la expresión imparcial del juicio del jurado. Véase el caso de *El Pueblo* v. *David*, 19 D. P. R., 801, 806.

2. Hemos examinado el procedimiento seguido en la constitución del jurado, y se ajusta a lo prescrito en la ley tal como fué interpretada por esta Corte Suprema en el caso de *El Pueblo* v. *Morales* (a) *Yare Yare,* 14 D. P. R., 234.

3. Lo ocurrido con el jurado Fernández Mascaró, según consta del récord, fué como sigue: Fiscal: "¿Sostiene usted alguna doctrina contraria a la pena de muerte?" Jurado: "No soy partidario de la pena de muerte en principio." Fiscal: "Si la ley fijara para determinados casos un veredicto de culpabilidad que aparejara la pena de muerte ¿estaría usted en condiciones de dar imparcialmente el veredicto?" Jurado: "No siendo partidario en principio, tendría que forzarme." El Fiscal recusa a este jurado y la corte acepta la recusación. La defensa toma excepción.

A nuestro juicio la corte no cometió el error que se le atribuye. Si bien el jurado Mascaró no expresó categóricamente que a causa de sus opiniones estaba impedido de rendir su veredicto, manifestó que tendría que forzarse por no ser en principio partidario de la pena de muerte, y, en casos similares, las cortes han resuelto que procede la recusación. Véanse *State* v. *Banerly* (Mo.), 46 S. W., 609, y *Rehea* v. *State* (Neb.), 88 N. W., 789, 792 y 793.

4. El cuarto señalamiento de error está íntimamente relacionado con el segundo. Después de haberse examinado un gran número de jurados que fueron recusados unos motivada y otros perentoriamente por ambas partes, quedaron al fin en sus puestos doce y entonces la corte invitó al acusado a recusar perentoriamente y el acusado manifestó que deseaba que constara que aceptaba al último jurado elegido José Rosado y que volvía a pedir permiso para hacer recusaciones perentorias en el resto del jurado. La corte negó el permiso y la defensa tomó excepción. Según el procedimiento que se había seguido, la defensa había tenido ya una oportunidad para recusar perentoriamente a todos y cada uno de los miembros del jurado y lo que la defensa pedía era una segunda oportunidad. La actitud de la corte se ajustó estrictamente

a la ley y a la jurisprudencia. Véanse el artículo 221 del
Código de Enjuiciamiento Criminal, el ya citado caso de *El
Pueblo* v. *Yare Yare,* y el de *El Pueblo* v. *Vázquez,* 20 D. P. R.,
361, 366 y 367. En el primero de dichos casos esta Corte
Suprema, basándose en jurisprudencia de la Corte Suprema
de California, por medio de su juez Sr. MacLeary, se ex-
presó así:

    "En causas criminales, al formar el jurado, deben sacarse doce
nombres de la urna conteniendo los nombres de los jurados capaci-
tados, para servir como tales; y el acusado puede examinarlos a todos,
antes de ejercer su derecho de recusación perentoria con respecto
a cualquiera de ellos; y aquellos que no hayan sido recusados ni
excusados deben entonces prestar juramento para juzgar la causa,
después de lo cual se extraerán de la urna tantos nombres como sean
necesarios para suplir los que faltan, repitiéndose este procedimiento
hasta que esté completo el jurado." *El Pueblo* v. *Morales* (*a*) *Yare
Yare,* 14 D. P. R., 234, 239.

    . Para cerrar la discusión de este alegado error, diremos
que el acusado llegó a recusar perentoriamente a unos doce
jurados y que nada hizo constar, ni intentó hacer constar,
ni aparece en modo alguno del récord, sobre el hecho de que
el jurado que lo juzgó finalmente no fuera un jurado verda-
deramente imparcial.

    5. La testigo Amparo Zeno había sido anteriormente con-
denada por el delito de desacato cometido al declarar falsa-
mente ante el tribunal. El juez en sus instrucciones expresó
ese hecho al jurado, pero le manifestó que el que tal hecho se
hubiera realizado no implicaba necesariamente que se dejara
de dar crédito a la declaración de la testigo, tanto más cuanto
que sus manifestaciones habían sido corroboradas por las
de Delfina Lamboy. Esto es, en síntesis, lo ocurrido, y no
podemos en tal virtud concluir que se haya cometido por la
corte ningún error fundamental que lleve consigo la revo-
cación de la sentencia.

    6. Al referirse a "circunstancias atenuantes," el juez, en
sus instrucciones, dijo al jurado que podía declarar al acusado

culpable de asesinato en primer grado con circunstancias atenuantes, y le dijo también que la regla general era que la
prueba de tales circunstancias debía someterse a la corte
encargada de dictar la sentencia antes del pronunciamiento
de ésta.

El artículo 202 del Código Penal, es como sigue:

"Toda persona culpable de asesinato en primer grado incurrirá
en pena de muerte, o si hubiere circunstancias atenuantes se le impondrá la pena de reclusión perpetua; si se confesare culpable, el tribunal determinará la pena; y toda persona culpable de asesinato en
segundo grado incurrirá en pena de presidio por un término mínimo
de diez años.

"Cuando, en algún caso, la sentencia del tribunal dispusiere la
muerte del reo, se cumplirá dicha sentencia."

Y el 320 del Código de Enjuiciamiento Criminal, dice así:

"Después de una confesión o veredicto de culpabilidad y siempre
que se deje a discreción del tribunal la magnitud de la pena, el tribunal, a indicación verbal de cualquiera de las partes, de que hay
circunstancias agravantes o atenuantes de la pena que puedan justamente ser tomadas en consideración, puede, a su arbitrio, oir brevemente esa indicación en el plazo que fije y dando aviso a la parte
contraria, en la forma que estime conveniente."

Los artículos de los Códigos Penales de California, Montana e Idaho que corresponden al 202 del de Puerto Rico, difieren esencialmente. Por el 190 del de California se dispone
que toda persona culpable de asesinato en primer grado sufrirá la pena de muerte o la de reclusión perpetua, a discreción del jurado que juzgue la causa; que cuando el acusado
se confiesa culpable, la corte determinará la pena, y que toda
persona culpable de asesinato en segundo grado será castigada con presidio por no menos de diez años. Y por las secciones 353 del Código Penal de Montana y 4864 de los Códigos de Idaho se prescribe simplemente que toda persona culpable de asesinato en primer grado sufrirá la pena de muerte,
y toda persona culpable de asesinato en segundo grado será

castigada con presidio por un término no menor de diez años, pudiendo·extenderse la prisión hasta fijarla por toda la vida del sentenciado.

Las secciones de los Códigos de Enjuiciamiento Criminal de dichos tres Estados correspondiente a la 320 del nuestro, son iguales.

De ahí que no hayamos podido encontrar en la jurisprudencia que usualmente aplicamos para interpretar nuestra vigente ley penal, ninguna decisión aplicable.  Tampoco la hemos encontrado en la acreditada obra de Wharton sobre Homicidio.

La práctica seguida en Puerto Rico desde la instauración del nuevo Código Penal, ha sido la de permitir al jurado que aprecie en su veredicto las circunstancias atenuantes en' el caso de que realmente existan.  No consideramos que dicha práctica sea contraria a la ley, ni vemos motivo alguno para recomendar que no se siga en el futuro.

Ahora bien, el que el jurado tenga esa facultad en los casos de asesinato, no implica que en dichos casos no pueda aplicarse además el procedimiento fijado en el artículo 320 del Código de Enjuiciamiento Criminal.  De ahí que no podamos concluir que sea errónea la instrucción de que se trata.  Por otra parte, el acusado no ha demostrado que existen verdaderas circunstancias atenuantes que puedan apreciarse en su favor para bajar el grado de la pena.  De la prueba, como seguidamente veremos, resulta que el acusado tuvo relaciones ilícitas con su víctima y que aun después de haberlas roto, no quería que ésta las llevara, como al parecer las llevaba, con otros hombres.  De ahí surgió su deseo de asesinarla. Tales circunstancias son pertinentes para explicar el móvil del delito, pero no para atenuar la responsabilidad penal del delincuente.  "Y celos o deseo de venganza, no excusan, ni justifican o atenúan el homicidio."  Wharton on Homicide, p. 202, citando a *State* v. *Burns,* 148 Mo., 167, 71 Am. St. Rep., 588; *Ex parte Jones,* 31 Tex. Crim. Rep., 422, 20 S. W., 983.

Véase también lo consignado en la página 930 de la misma obra.

7. Veamos, por último, si el veredicto es contrario a la ley y a la prueba, como sostiene el acusado.

El doctor Cueto, médico cirujano, declaró que en la tarde del ocho de septiembre de 1912 practicó la autopsia de una joven de veinte años de edad, llamada Serafina Dones, a quien había reconocido en estado agónico en la madrugada del mismo día. El cuerpo de la muerta presentaba las siguientes heridas: una incisa en la parte anterior y superior del pecho; dos incisas en la glándula mamaria. otra en el costado, en el tercio medio derecho; otra en la parte superior del brazo derecho, profunda, llegando hasta el hueso; dos más en el mismo brazo; tres en el brazo izquierdo; otra en el tercio superior y medio del muslo izquierdo; otra en la parte superior y externo de la pierna izquierda que llegó a fracturar el peroné; dos pequeñas heridas más en la misma pierna y otra en el pie, y, por último, una herida transversal en el vientre con salida de la masa intestinal. La muerte se debió especialmente a consecuencia de dos de las heridas, la de la cavidad toráxica y la del vientre, por hemorragia interna, y, a juicio del doctor, gran número de las lesiones debieron ocasionarse estando la víctima acostada boca arriba y el agresor de pie, sin que existiera en el cuerpo de la muerta vestigio alguno de lucha.

Francisco García, que vivía con el acusado en una misma habitación, declaró que el acusado le dijo, el lunes de una semana, que hacía más de un mes que habían terminado sus relaciones con Serafina; que el jueves de esa misma semana también le dijo que iba a comprar un cuchillo para vengarse de Serafina Dones; que en la noche del 7 de septiembre o sea el sábado de la indicada semana, como a las ocho, se hallaba parado en la Plazuela de San José con el acusado cuando pasó Serafina acompañada del soldado García y el acusado dijo, dirigiéndose a la Dones: "Esos zapatos que has comprado no los vas a gozar, porque te voy a matar esta noche."

El soldado Manuel García depuso que el 7 de septiembre acompañó a Serafina Dones a comprar unos zapatos; que a su regreso, como de ocho a nueve de la noche, pasaron por la plaza de San José y al ver Serafina al acusado que allí se encontraba, le dijo: "Este señor que está aquí ha jurado matarme." Que pasaron por frente del acusado y entonces éste dijo, dirigiéndose a Serafina: "Esos zapatos no los gozarás porque te mato." Que dejó a Serafina en su casa y después, en la madrugada del día siguiente, se enteró de que había sido asesinada.

Juan Boto, dependiente de una ferretería, declaró haber vendido el 7 de septiembre, como a las tres y media de la tarde, a una persona parecida al acusado, un cuchillo de igual clase que el que se le presentó en el acto de la vista y que fué ocupado por la policía (declaraciones de Francisco García y Enrique Pino), en poder de la madre de Mateo Concepción.

Modesta Ferrer dijo que vió pasar al acusado por frente de la casa en que vivía Serafina como a las diez y como a las once y media de la noche del 7 de septiembre.

Delfina Lamboy, que dormía en una habitación separada por un cancel de la en que también dormía Serafina, sintió un "¡ay!" que dió ésta en la madrugada del ocho de septiembre, se levantó y vió cuando el acusado le estaba dando puñaladas. Que gritó y el acusado echó a correr y entonces fué a ayudar a Serafina que se apeaba del catre y cayó al suelo ensangrentada. Que salió al patio y encontró a Amparo Zeno que dijo: "Es Mateo" y salió precipitadamente en busca de la policía.

Y Amparo Zeno, que también vivía en la misma casa que Serafina y que se había levantado en la madrugada del 8 de septiembre a preparar su trabajo, oyó gritar a Delfina Lamboy que habían matado a Serafina y en ese momento vió salir de la habitación, descalzo, al acusado, y se fué corriendo detrás de él gritando a la policía para que lo cogiera.

Este es, a grandes rasgos, el resultado de la prueba de cargo que aun contiene más detalles reveladores de la preme-

ditación del acusado. El crimen cometido por Mateo Concepción, reviste, pues, todos los caracteres de un asesinato en primer grado y al apreciarlo y declararlo así, ni el jurado ni la corte cometieron error alguno, a nuestro juicio.

Debe confirmarse la sentencia apelada.