THE STATE v. ABSALOM KINDER, Appellant.

Division Two, November 22, 1904.

1. **MURDER: Manslaughter.** The deceased and defendant, traveling in wagons, met in a public road. The State's evidence was to the effect that deceased spoke to defendant in the usual way. Defendant replied with insulting words, got out of his wagon, went around in front of his team, cursing deceased, drew his knife, and told him to get out and fight him. Deceased replied that he would fight him a fair fight, and to put up his knife. Defendant put up his knife, but gathered up a large stick, and threatened to strike deceased where he was sitting on a high seat and to knock him out of the wagon. Thereupon, deceased jumped down, his head lowered, and defendant struck him on the back of the head, and followed this with other blows which caused death. *Held,* first, that the jumping of deceased from the high seat was no assault upon defendant, for it was, under the circumstances, but the natural thing for him to do. *Held,* second, that the closing up of the knife, while a fact to be considered by the jury, was not conclusive that there was no intention to kill. *Held,* third, that the contention that the only grade of offense that should have been submitted to the jury was manslaughter in the fourth degree, cannot be sustained, but that the court did not err in submitting all the degrees of homicide, and the facts authorized a verdict of murder in the second degree.

2. ————: **Conflicting Evidence: Self-Defense.** Where the evidence for the State shows murder in some degree, and that of the defendant shows a killing in self-defense, it is the province of the jury to determine the question.

3. ———: **Intent: Presumption: Instruction.** It is not essential that the court should embody in an instruction a direction of what particular state of facts will authorize the presumption that defendant intended the consequences of his act, if the instructions are otherwise correct and require the jury to find that there was an intent to kill. The defendant is not injured or prejudiced by the failure of the court to tell the jury how, in finding an essential element of the offense, they may indulge a presumption against him. Such an instruction would be regarded as one favorable to the State, and could not prejudice the defendant.

4. ———: ———: **Instructions As a Whole.** Instructions must be considered all together, and if, as a whole, they present all the essential elements of the offense, they are not erroneous, notwithstanding some of them, when considered separately, may not present fully all the questions which should be submitted to the jury. And in this case it is held that the instructions, considered as a whole, fully presented the question of intent to kill.

5. ———: ———: **In Second Degree.** The fact that in a separate instruction for murder in the first degree, stress is laid upon the necessity of an intent to kill, is not calculated to mislead the jury in respect to the necessity of finding an intent to kill in determining defendant guilty of murder in the second degree, if the direction to find that intent to exist is clearly presented by the other instructions taken as a whole.

6. ———: **Violent Passion: Assumption.** It is held in this case that the instructions did not assume that the defendant was in a violent passion. There was evidence of the presence of the passion, and the wording of the instruction (number 4) does not justify the criticism that its existence was assumed.

7. ———: ———: **Definition.** No other definition of "violent passion" is necessary than that the blow was struck while defendant was "in a violent passion, suddenly aroused by insulting and abusive language."

Appeal from Cape Girardeau Circuit Court.—*Hon. Henry C. Riley*, Judge.

AFFIRMED.

*William H. Miller* and *Wilson Cramer* for appellant.

(1)   There is no evidence in the cause to justify the giving of an instruction for murder in the second

degree, and the court erred in instructing the jury upon that grade of homicide. (2) Instruction 2 is erroneous in that it fails to tell the jury that the striking with the club must have been upon a vital part, in order to raise the presumption that defendant intended the natural and probable consequences of the striking. (3) Said instruction 2 is erroneous because it ignores the element of an attempt to kill, which is necessary to constitute murder in the second degree. (4) The court erred in giving instruction 3 declaring that, in order to convict of murder in the first degree, the jury must find "that defendant not only struck the deceased, Arthur Kinder, with a deadly weapon upon a vital part intentionally, but that he struck the blow intending to kill him"—thus emphasizing the necessity of an intent to kill in murder in the first and by necessary and natural inference excluding such intent in murder in the second degree. (5) The undisputed proof shows that when defendant struck the first lick the deceased was in the act of approaching upon him, and the court erred in giving instruction 4 and assuming that defendant struck "while in a violent passion suddenly aroused by insulting and abusive words spoken to him by deceased." There is no evidence upon which to base this instruction which naturally obscures defendant's plea of self-defense. (6) The court, while using in said instruction the term "violent passion," failed to define the meaning thereof. (7) The verdict is not supported by the evidence, but is evidently the result of passion and prejudice, and the court erred in refusing to set the same aside.

*Edward C. Crow,* Attorney-General, and *C. D. Corum* for the State.

(1) We think the evidence sufficient to warrant the court in instructing for murder in the second degree. While it is true that the language of the deceased was not such as usually transpires in cases of

this character, yet it was sufficiently positive and of such character as to arouse the ire of the defendant; and that it had this effect is manifest from the language used by the defendant. Even though the language was not abusive, it was of such a nature as to arouse the passion of the defendant, and evidently insulted him. It was a question for the jury whether the language and conduct of the deceased was of such a character as to deprive the defendant of the power of deliberation. (2) There is no issue between counsel and us, as to the law, that, in order to constitute murder in the second degree, there must be an intent to kill. But it has long been the law in this State that the law presumes murder in the second degree from the simple act of killing. He who uses upon another, at some vital part, a deadly weapon, as in this case, in the absence of qualifying facts, must be presumed to know that the blow is likely to kill, and knowing this, must be presumed to intend death, which is the probable and ordinary consequence of such an act. State v. Holm, 54 Mo. 153; State v. Gassert, 65 Mo. 325; State v. Bauerle, 145 Mo. 23. (3) Instruction number two, defining murder in the second degree, is attacked on the ground that it ignores the element of an intent to kill. It follows the formula that has been frequently observed by this court. State v. Wilson, 98 Mo. 448; State v. Elliott, 98 Mo. 150; State v. Bauerle, 145 Mo. 18; State v. Hyland, 144 Mo. 311. Under this instruction, before the defendant could be convicted it was necessary for the jury to find that the defendant willfully struck the deceased. If this instruction were to be considered alone, and without regard to the other instructions, it probably could not be upheld. But the instructions bearing upon the offense must be read together. And if they all present the law, when thus considered, that is all that is necessary. Of course, the jury must find that there existed in the mind of the defendant, at the time of the homicide, an intent to kill, and while the instruction under consideration did not, in terms, tell the jury that such an intent was

necessary, it did tell the jury that "if they believed from the evidence that the defendant willfully," etc., then they should find him guilty. The word "willful" was correctly defined by the court in the seventh instruction, and the words "malice" and "malice aforethought" were also correctly defined. If, then, the word "willfully" means intentionally, and the word word "malice" means a wrongful act done intentionally, without just cause or excuse, and the words "malice aforethought" mean that the act was done with malice and premeditation, as these words were defined by the court, then the court advised the jury that before they could convict the defendant of murder in the second degree, they must find that he killed the deceased intentionally and wrongfully. This was all that the law requires. State v. Smith, 164 Mo. 586. (4) We do not think that instruction 4 assumes that the defendant struck the blow while in a violent passion, suddenly aroused by insulting words. It told the jury that if they believed and found from the evidence that he was in a violent passion, suddenly aroused, etc. There was no assumption in this. Orscheln v. Scott, 79 Mo. App. 534. (5) It was unnecessary for the court to define the term "violent passion," as the defendant was found guilty only of murder in the second degree. State v. Moore, 156 Mo. 212. But we think that the court did define the term, "violent passion," when it used this language: "But although the defendant may have struck the blow, while in a violent passion, suddenly aroused by insulting and abusive words, spoken to him by the deceased." No further definition was necessary. State v. Rose, 142 Mo. 429. It was unnecessary to define the term "violent passion;" but if necessary, the defendant, in order to have availed himself of that, should have called the attention of the trial court to its failure in this regard before the case was submitted to the jury, and have excepted on the ground that the court had failed to instruct on all the law in the case. State v. Cantlin, 118

Mo. 100; State v. Paxton, 126 Mo. 500; State v. Woods,. 137 Mo. 6; State v. Rose, 142 Mo. 429.

FOX, J.—This case comes to this court by appeal from a conviction of murder of the second degree.

The defendant and appellant in this cause was charged by indictment, duly presented by the grand jury in Cape Girardeau county, Missouri, with murder of the first degree. The instrument charged to have been used in the commission of the offense was a large club, a piece of a fence rail, four feet long, four inches broad and two inches thick. There is no complaint by counsel for appellant urged against the indictment; it is in harmony with the approved forms, hence no necessity for reproducing it here. There was a trial upon this indictment, defendant was found guilty of murder in the second degree, and his punishment assessed at imprisonment in the penitentiary for a term of ten years.

The record in this cause indicates that there were only three persons present at the difficulty; the defendant, the deceased, and one Luther Eakins. As to what occurred at the time and place of the killing, two witnesses testify, Luther Eakins for the State, and the defendant for himself. It is apparent from the record before us that the relations between the defendant and the deceased were not of the most cordial nature, notwithstanding they were cousins. We can more fully appreciate the main facts upon which this case was submitted to the jury by reproducing the statements of the only two living witnesses present at the difficulty:

Witness Luther Eakin testified as follows:

"Q. Now, you may tell the jury if there was any trouble between Arthur Kinder and the defendant, you may tell them what it was, how it came up? A. Well, sir, we, me and Arthur Kinder, had hauled off a lot of wheat that morning, Friday morning, and we went by his lower farm to get a load of pumpkins, and started

back, and in there by George Gross's in the Schlueter lane we met Ab Kinder; well, sir, he drove to the side of the road and stopped.    When Arthur came up he spoke to Ab; he says, 'Hi Ab,' and Ab says, 'Kiss my —'; well, what Arthur said I didn't understand much. Ab then commenced; Ab he reached in his pocket and got his knife, and jumped out of his wagon and run around to Arthur's front wheel, went clear around his team to his right front wheel, and he says, 'Now, God damn you, if you want anything out of me just get out.' Arthur says, 'Put up your knife in your pocket Ab, I will fight you a fair fight.'    He says, 'I will put my knife in my pocket when I get God damned good and ready,' then he put his knife in his pocket and picked up a two-foot piece of rail, about two feet long.    He says, 'You have been running about with your God damned lies long enough;' he says, 'You told it about that I killed myself.'    Arthur says, 'I didn't do any such a thing, I can face the one that said that.'    Ab says, 'You told it.'    Arthur asked him who it was; he told him who it was; it was one of the Rhodeses, I didn't understand the first name.    Then he throwed that club down and he picked up this here one that he hit him with, about five feet long, and Arthur says, 'I know what is the matter with you Ab;' he says, 'You are mad because you thought I helped George Kinder beat you out of that girl.'    He says, 'You did, God damn you;' Arthur said he never done any such a thing.    He says, 'You did;' he says, 'God damn you, I will knock you out of there directly,' and Arthur he jumped, and when he hit the ground he kind of made a bow forward, and Ab struck him on the back of the head with that piece of rail and knocked him to his hands and knees, and Arthur was trying to get up, crawling forward, and he hit him again; he crawled about a yard after the first time, and tried to get up, and Ab struck him in the face, then he fell on his belly on the ground, and his face was in the mud and dirt.''

Injuries were inflicted, upon the deceased by those blows, from which injuries he died the following or next succeeding day.

Upon cross-examination, he testified, partly, as follows:

"Q.   When he jumped out you saw the defendant standing facing—?   A.   Standing facing him?

"Q.   Facing the wagon?   A.   Yes, sir.

"Q.   Facing the wagon?   A.   Facing the wagon and Arthur, too.

"Q.   In what direction did Arthur jump?   A.   In what direction did he jump?

"Q.   Yes, sir.   A.   I could not tell you.

"Q.   Did he jump towards the defendant?   A. Yes, sir.

"Q.   With his hands up?   A.   I never noticed whether his hands were up or not."

Defendant's version of this difficulty is as follows:

"Q.   What relation, if any, was Arthur Kinder to you?   A.   Second cousin, I believe.

"Q.   Second cousin?   A.   Yes, sir.

"Q.   Now state to the jury all about the difficulty between you and him on October 16 last—just turn to the jury and tell them all about it, how it came up and all about it:   A.   Well, we met there in the Schlueter lane Friday, October 16—it is called Schlueter lane, I think that is what they call it, Friday, October 16, we met there.   I drove out to the side of the road there. We both met there and stopped.

"Q.   How were you travelling?   A.   In a wagon.

"Q.   How was he travelling?   A.   He was in a wagon.

"Q.   In what direction were you going?   A.   I was going east and he was going west.

"Q.   Well, go on.   A.   He drove up and stopped and spoke to me.   I didn't speak to him in the way he expected me to speak.   When I spoke that he dared me out.

"Q. State what he said to you? A. He dared me out.

"Q. At that time where were you? A. In my wagon.

"Q. In the wagon? A. Yes, sir.

"Q. Where was he? A. He was in his wagon then.

"Q. He was in the wagon? A. Yes, sir.

"Q. Who stopped first, you or he? A. Both stopped something at the same time.

"Q. He dared you out—go on? A. I didn't get out—commenced wrapping up his lines—they got out —he dared me out three times.

"Q. Who got out first? A. Arthur did.

"Q. Arthur got out first? A. Yes, sir.

"Q. Go on: A. He dared me out three times, twice after he got out and once before he got out of his wagon. He stepped out of his wagon, his left foot was yet on the hub of the wagon, holding with his left hand on the sideboard, his right hand in his pocket. He dared me out the third time. I told him if he wanted me out so bad I could get out. I did so. When I got out, as I got out of the wagon, I took my knife out.

"Q. What kind of a knife did you have? A. Common pocket knife.

"Q. You took it out? A. Yes, sir.

"Q. Go on. A. When I got out I took my knife out, when I got out I opened it; he asked me, told me to put my knife in my pocket. I did so. I picked up a piece of rail then; he asked what I was going to do with it, I told him use it on him if he come at me; he told me to lay it down and fight me a fair fight; I told him I didn't propose to fight two men a fair fight. I put the rail down, that piece after he told me; there was another lying to the side of me, I picked that up; he asked what I was going to do with that, I told him I was going to use it on him if he come at me.

"Q. Is that the piece you used there? A. I could not state. I never looked at the rail.

"Q. Where was the piece of rail you picked up, the second piece? A. Lying in the north side of the fence to the left side.

"Q. Go on. A. I picked that up; by the time I got that and straightened up he threw his arms up that way, above his head, bowed his head and come at me. I was standing at the head of his team; he was back to his wagon with his left foot on the hub of the wagon and his right foot on the ground, and he come at me then with his arms up that way.

"Q. How many steps did he come towards you? A. I could not tell the steps, to the best of my knowledge it was something like twelve feet.

"Q. State how he came? A. He came in this position (indicating) with his head down that way and his hands up over.

"Q. Did he come rapidly or not? A. Yes, sir; he came pretty peart.

"Q. What then occurred? A. When he got in reaching distance of me I hit him.

"Q. How many times did you strike him? A. I struck him three times.

"Q. Three times? A. Yes, sir.

"Q. What become of him then? A. I only knocked him to his knees the first time; he got up and come at me again, I struck him and knocked him down that time.

"Q. What became of him then? A. He yet come at me.

"Q. Well, after you struck him the third time what did he do, what became of him then? A. He fell to the ground then.

"Q. Did you strike him any more then? A. No, sir; I did not.

"Q. What did you do then? A. I didn't do anything more.

"Q. What did you do with your stick? A. I dropped it down.

"Q. And where did you go then? A. I got back by the side of my wagon; by that time Luther Eakins came up there with a fence rail and told me if I moved he would knock my God damned brains out. He gave me a fearful cursing.

"Q. Luther Eakins? A. Yes, sir.

"Q. What did he have in his hands? A. A rail."

There was also testimony offered by the State to the effect that defendant said on one occasion that he would settle the deceased; and that, at another time, he stated that if he and the deceased met there would be bloodshed; however, it was shown that these conversations were a long time before the fatal difficulty, and that defendant and deceased had met on different occasions, and there was no effort to execute the threats indicated herein. There was testimony offered by defendant, showing a good reputation as a peaceable and law-abiding citizen in the community in which he resided.

We have read in detail all the testimony in this cause, but deem it unnecessary to recite it. The main facts upon which the judgment rests are sufficiently indicated to enable us to dispose of the legal propositions involved.

Upon this state of facts, the court declared the law as follows:

"1. The court instructs the jury that if you believe and find from the evidence that at the county of Cape Girardeau and State of Missouri, at any time before the finding of the indictment herein, the defendant did willfully, deliberately, premeditately and of his malice aforethought, strike one Arthur L. Kinder with a large club, the same being a dangerous weapon, inflicting upon him a mortal wound, from which said mortal wound the said Arthur L. Kinder within one year thereafter, in the county of Cape Girardeau and State

of Missouri, died, then you will find the defendant guilty of murder in the first degree, and by your verdict simply say so. In that case you have nothing to do with the punishment; to the court belongs the responsibility of fixing the punishment.

"2. The court also instructs the jury that if you believe from the evidence that in the county of Cape Girardeau and State of Missouri, at any time before the filing of the indictment herein, the defendant did willfully, premeditately and of his malice aforethought strike one Arthur Kinder, but without deliberation, with a large club, the same being a dangerous weapon, inflicting upon him a mortal wound, from which said mortal wound the said Arthur L. Kinder within a year thereafter, at the county of Cape Girardeau and State of Missouri, died, then you will find the defendant guilty of murder in the second degree, and assess his punishment at imprisonment at not less than ten years in the penitentiary.

"3. You are instructed that in order to convict the defendant of murder in the first degree, you must believe and find from the evidence that defendant not only struck the deceased, Arthur Kinder, with a deadly weapon upon a vital part, intentionally, but that he struck the blow intending to kill him. In this connection, however, you are instructed that, in the absence of qualifying facts and circumstances, a person is presumed to intend the natural, ordinary and probable results of his acts. Wherefore, if you believe from the evidence that defendant intentionally struck deceased, Arthur Kinder, on the head, a vital part, with a deadly weapon, from which death resulted, you will find that he intended to kill. And you will in that event also find that malice was the concomitant of the act.

"4. The court instructs the jury that if you believe and find from the evidence that in the county of Cape Girardeau and State of Missouri, at any time before the filing of the indictment herein, defendant

struck Arthur L. Kinder with a large club, the same being a dangerous weapon, inflicting upon him a mortal wound, from which said mortal wound the said Arthur L. Kinder within a year thereafter, at the county of Cape Girardeau and State of Missouri, died, and that the defendant inflicted said blow while he was in a violent passion suddenly aroused by insulting or by abusive language spoken by deceased to him, then such killing was not done with deliberation; but although the defendant may have struck the blow while in a violent passion suddenly aroused by insulting or abusive words spoken to him by the deceased, yet if such killing was done willfully, premeditatedly and of his malice aforethought, as explained in these instructions, defendant is guilty of murder in the second degree.

"5.   If the jury believe from the evidence that the defendant killed the deceased with a large club about four feet in length and four inches in breadth, and two inches thick, and that the same was a dangerous weapon, in a heat of passion and without a design to kill him you will find him guilty of manslaughter in the third degree, unless you further find from the evidence such killing was done in self-defense, as explained in the instructions herein, in which event you will find him not guilty.  If the jury find the defendant guilty of manslaughter in the third degree you will assess his punishment by imprisonment in the penitentiary not less than two or more than three years; or by imprisonment in the county jail not less than six months, or by a fine not less than five hundred dollars, or by a fine not less than one hundred dollars and imprisonment in the county jail not less than three months.

"6.   Manslaughter is the intentional killing of a human being in a heat of passion, on a reasonable provocation, without malice and without premeditating, as these terms are herein defined, and under circumstances that will not be justifiable or excusable homicide.  And if the jury find and believe that the defendant in a

sudden passion, on a reasonable provocation, intentionally struck and killed the deceased, without malice or premeditation and not in the necessary defense of his person, then the jury should find him guilty of manslaughter in the fourth degree and assess his punishment by imprisonment in the penitentiary for a term of two years, or by imprisonment in the county jail not less than six months, or by a fine not less than five hundred dollars, or by a fine not less than one hundred dollars and imprisonment in the county jail not less than three months.

"7. The court instructs the jury that the term willfully as used in the instructions means intentionally, that is, not accidentally.

"Deliberately means in a cool state of the blood, not in a sudden passion engendered by a lawful or some just cause or provocation.

"Premeditately means thought of beforehand for any length of time, however short.

"Malice in common acceptation means ill-will against a person; but in its legal sense it means a wrongful act done intentionally, without just cause or excuse.

"Malice aforethought means that the act was done with malice and premeditation.

"8. The court instructs the jury that the right of self-defense is a right which the law not only concedes but guarantees to all men. The defendant may therefore have killed deceased and still be innocent of any offense against the law. If at the time he struck deceased he had reasonable cause to apprehend on the part of deceased a design to do him great personal injury and there was reasonable cause for him to apprehend immediate danger of such design being accomplished, and to avert such apprehended danger he struck deceased and at the time he did so he had reasonable cause to believe and did believe it necessary for him to use the piece of rail in the way he did to protect himself from such apprehended danger, then and in

that case the striking was not felonious, but was justifiable, and you ought to acquit him upon the ground of necessary self-defense. It is not necessary to this defense that the danger should have been impending and immediately about to fall; all that is necessary is that defendant had reasonable cause to believe and did believe these facts. But before you acquit on the ground of self-defense you ought to believe that defendant's cause of apprehension was reasonable.

"Whether the facts constituting such reasonable cause have been established by the evidence you are to determine, and unless the facts constituting such reasonable cause have been established by the evidence in the cause, you can not acquit in such case on the ground of self-defense, even though you may believe that the defendant really thought he was in danger.

"9. The court instructs the jury that the burden of proof to establish the guilt of the defendant rests upon the State, and the defendant is presumed to be innocent of the charge against him, and this presumption of innocence attends and protects him throughout the trial until overcome by evidence which shows the guilt of the defendant beyond a reasonable doubt. If the jury have a reasonable doubt of the defendant's guilt you should give him the benefit of such doubt and acquit him. By reasonable doubt is meant a doubt which has reason for its basis and arising from a consideration of all the evidence in the case and not a mere possibility of his innocence.

"10. The court instructs the jury that the previous good character of the defendant, if proven to your reasonable satisfaction, is a fact in the case which the jury should consider in passing upon the question of the defendant's guilt or innocence; but if all the evidence in the case, including that given touching the previous good character of the defendant, shows him to be guilty of the offense, then his previous good character can not justify, excuse or mitigate the offense.

"11.  The jury are the sole judges of the credibility of the witnesses and of the weight and value of their testimony.  In determining such credit, weight and value, you will take into consideration the character of the witness; his or her manner on the stand and of testifying; his or her interest, if any, in the result of the case; his or her relation to or feeling for the defendant or the deceased; the probability of his or her statement, as well as all other facts and circumstances detailed in evidence, and in this connection you are further instructed that if you believe any witness has willfully sworn falsely to any material fact in the case you are at liberty to disregard or treat as untrue the whole or any part of such witness's testimony."

Upon the cause being submitted to the jury they returned a verdict as before stated, finding the defendant guilty of murder of the second degree, and assessing his punishment at imprisonment in the penitentiary for ten years.  Upon this verdict judgment was rendered, and after an unsuccessful motion for new trial defendant in due time and form prosecuted his appeal to this court, and the record is now before us for review.

### OPINION.

Numerous errors are assigned and urged by learned counsel for appellant as reasons for the reversal of the judgment of the trial court in this cause. We will dispose of the complaints, in respect to errors committed, in the order in which they are assigned in the brief, as well as in oral argument.

First.  It is contended that upon the state of facts developed upon the trial the only grade of the offense which should have been submitted to the jury was that of manslaughter in the fourth degree, and that the trial court should have limited its declarations of law to that grade.  To this contention we are unable to give our sanction.  It may be said that if the testimony of the

State and defendant were in harmony, this contention could be very appropriately maintained; but this cause does not fall within the exception to the usual conditions surrounding controversies of this character. There are two sides to it. That Arthur Kinder was killed, there is no dispute; but the facts and all the surrounding conditions, the conduct and acts of the parties at the time of the fatal difficulty, are sharply presented by the irreconcilable conflict in the testimony of the only two eye-witnesses to this unfortunate occurrence. Upon the testimony of witness Eakins, the court was clearly warranted in submitting the cause to the jury upon the grades of the offense indicated by the instructions. If the testimony as detailed by that witness is to be believed, then it can be truly said there was little or no provocation for this killing. These parties met on the road, and conceding that deceased could have driven on, but stopped, the mere stopping did not authorize an attack upon him. The deceased used no harsh words; but upon simply addressing the defendant in no angry manner, the witness says that defendant drew his knife, rushed clear around the team to the right front wheel of the wagon of deceased, and commenced the difficulty which resulted in the death of Arthur Kinder. Upon request he put up his knife, picked up a piece of rail about two feet long, began swearing at the deceased, finally threw this piece down and picked up another piece about four or five feet long, and threatened to knock the deceased out of his seat in the wagon; it was at this time that deceased jumped from the wagon, and, as the witness puts it, "kind of made a bow forward, and Ab struck him on the back of the head."

It will be observed from the statement of this witness that the seat in the wagon upon which deceased was sitting was rather high from the ground, and according to Eakins' testimony, Arthur Kinder, when the defendant threatened to knock him out of the wagon, then jumped to the ground. This jumping out of the wagon

near the defendant should not be construed an assault upon him, for it was but the natural thing for him to do, when in the presence of the defendant, with a four or five foot piece of rail in his hand threatening to knock him out of his wagon. It is earnestly and ably argued that the closing up of the knife was an indication that there was no intent to kill; that was a fact to be considered by the jury; but that fact does not make it conclusive that there was no such intent. It also appears that defendant threw away his short piece of rail, and secured one of much greater length. It may be that the last instrument picked up, being of much greater length, was a more suitable weapon to do the deceased harm, in the elevated position that he occupied, than a knife or the short club first selected. However this may be, the instrument with which the wounds were inflicted was before the jury, and the manner of their infliction was detailed by the witnesses; it was specially the province of the jury to determine from all the facts the intent of the defendant in making the assault.

Now, this is a brief statement of the State's side of this case. On the other hand, the defendant details fully and clearly his version of that occurrence at the time of this fatal difficulty. It must be conceded, if this testimony is true, it was a clear case of self-defense. It is apparent that the testimony of these two witnesses can not be reconciled, and with this conflict, we are confronted with the proposition as to where and by whom that question must be settled. Under the well-settled rules repeatedly announced by this court there can be but one answer to that question, and that is, it was a question to be submitted to the jury for their determination.

The witnesses were before the jury, doubtless the usual tests as to their credibility were applied. All the circumstances which led up to the fatal result of the meeting on that day of the deceased and the defendant were detailed, as well as the nature and character of the

weapon used, and we take it that it is no longer an open question that it was specially the province of the jury to say which state of facts they would believe. It may be said that witness Eakins was unfriendly to the defendant; it can, with equal propriety, be said that the defendant was a witness in his own behalf, and deeply interested in the result of the prosecution. However that may be, those were all matters for the consideration of the jury, and the burden of determining which one of those witnesses is to be believed, if the repeated rulings of this court are to be followed, can not be placed upon this court. The judgment of the trial court should not be disturbed upon the ground urged in the first contention.

It is next insisted that instruction numbered 2 is erroneous, first, because it fails to tell the jury "that the striking with the club must have been upon a vital part in order to raise the presumption that defendant intended the natural and probable consequences of the striking;" second, that it ignores the element of an intent to kill, which is necessary to constitute murder of the second degree. There can be no dispute upon the legal proposition that to constitute murder of the second degree there must be an intent to kill. It was not essential to a correct declaration of law that the court should have embodied in instruction numbered 2 a direction to the jury of what particular state of facts would authorize the presumption that he intended the consequences of his act, if the instructions were otherwise correct and required them to find that there was an intent to kill. Upon an examination of the numerous cases in this State, it will be found that in many of them no instruction is given as to presumptions to be indulged in determining the intent with which the act was committed, yet this failure is not error where the court requires the jury to find all of the essential elements of the offense.

The instruction as to this presumption is always re-

garded as a declaration favorable to the State, and we are unable to comprehend how defendant is prejudiced or injured by the failure of the court to direct the jury how they may indulge a presumption against him, in finding an essential element of the offense. It will be observed in this cause that the court did not, as applying to murder of the second degree, undertake to direct the jury as to the indulgence of any presumptions; if it had, and the instruction did not properly declare the law upon that subject, then a much more serious proposition would be presented for our consideration. The court did not undertake to embody a direction to the jury, in instruction numbered 2, as to the state of facts which would authorize a presumption against the defendant; and its failure to do so was not error. With highest respect for the able counsel presenting the questions in this case, and a careful consideration of the views expressed in brief, as well as in oral argument, we are unable to agree to the contention that instruction numbered 2 ignores the element of intent to kill, on the part of the defendant.

We start out at the very inception of the consideration of the proposition with the unqualified approval by this court of the form of this instruction. [State v. Bauerle, 145 Mo. 18; State v. Hyland, 144 Mo. l. c. 311, and numerous other cases.]

It is equally well settled by the repeated announcements from this court that instructions must be considered all together, and if, as a whole, they present all the essential elements of the offense, they are not erroneous, notwithstanding some of them, when considered separately, may not present fully all the questions which should be submitted to the jury. Applying this rule to the instructions in this case, we find that the essential element of intent to kill has not been ignored. Instruction numbered 2 requires the jury to find that the defendant ''willfully, premeditatedly and of his malice aforethought'' inflicted mortal wounds upon the

deceased, with a dangerous weapon, from which wounds death resulted.

Instruction numbered 7 defines the term willfully, as meaning intentionally and not accidentally; malice, as meaning, in its legal sense, a wrongful act done intentionally, without just cause or excuse.

We have added to this, by instruction numbered 4, a direction to the jury, not only that the assault with the weapon upon the deceased must be made intentionally; but it expressly tells the jury that if they find that the killing "was done willfully, premeditately and of his malice aforethought," then it was murder of the second degree. This direction is emphasized by the fact that the attention of the jury was clearly called to the meaning of the terms used in defining the offense. This question was thus presented to the jury by the court: "But although the defendant may have struck the blow while in a violent passion suddenly aroused by insulting or abusive words spoken to him by the deceased, yet if such killing was done willfully, premeditately and of his malice aforethought, as explained in these instructions, defendant is guilty of murder in the second degree."

This clearly and in plain terms tells the jury that if the killing was done willfully, premeditately and with malice aforethought, it was murder of the second degree, and the definitions of these terms were expressly pointed out to the jury. In view of the full scope of the instructions, we have reached the conclusion that "an intent to kill" was not ignored in the presentation of this case. The fact that in a separate instruction for murder of the first degree, stress is laid upon the necessity of an intent to kill, in our opinion, was not calculated to mislead the jury in respect to the necessity of finding an intent to kill in the grade of the offense of which defendant was found guilty.

There is only one remaining question. It is insisted that the court assumed, in instruction numbered

4, that defendant was in a violent passion, and failed to define the meaning of such passion. As heretofore stated, according to the statements of witness Eakins, there were no angry words used by the deceased. Yet there was a dispute between them as to rumors concerning defendant, charged to have been circulated by the deceased. This, with what the defendant testified, was sufficient upon which to predicate that instruction, and we are of the opinion that a reasonable and fair interpretation of the terms of the instruction does not subject it to the criticism that the fact of "violent passion" was assumed.

The term "violent passion" was sufficiently defined by the instruction in which the term was used. It substantially told the jury that it was a "violent passion" suddenly aroused by insulting and abusive language. This contention is fully answered in State v. Rose, 142 Mo. l. c. 429. BURGESS, J., in discussing this subject, said:

"A final contention is that the court failed to define 'heat of passion,' as used in the instructions, but this seems to be a misapprehension of the only instruction in which those words are used, to-wit, the fifth, wherein it is said, 'while the defendant was in a violent passion, suddenly aroused by reasons of Wells having shoved him, or struck him with his fist or hand,' or that defendant shot and killed Wells 'while in a violent passion, suddenly aroused by a shove or blow from Wells.' No further definition was necessary. But even if such definition was necessary, defendant, in order to avail himself of that objection, should have called the attention of the trial court to its failure in this regard before the case was submitted to the jury. [State v. Cantlin, 118 Mo. 111; State v. Paxton, 126 Mo. 500; State v. Woods, 137 Mo. 6.]"

What was said upon the subject in that case, may be very appropriately applied to the case at bar. It is clearly decisive of that point.

We have thus given expression to our views upon this extremely unfortunate difficulty, which resulted in the killing of Arthur Kinder by his cousin Absalom Kinder, upon the record before us. We have carefully considered in detail all the testimony. Have applied the approved tests to the controverted propositions presented by counsel. We find nothing in the record indicating that the jury were influenced in reaching their conclusion by bias or prejudice. The court covered all grades of the offense to which the testimony was applicable. The jury had the witnesses before them, the manner of the killing was fully detailed, the nature and character of the instrument used was fully shown. It was the special province of the jury to determine, from all the evidence in proof, as to the intent of the defendant.

With these views, we are unable to assign any reason why this judgment should be disturbed. The judgment of the trial court will be affirmed. *Gantt, P. J.,* concurs; *Burgess, J.,* absent.