## THE STATE v. CHARLES JOHNSON, Appellant.

**Division Two, May 20, 1913.**

1. **INSTRUCTIONS: Errors of Omission: Supplied by Others.** Errors of omission in instructions may be cured by other instructions which supply the omitted parts. This is what is meant when it is said that instructions are sufficient when, "taken as a whole, they correctly declare the law." The rule is different where an instruction is expressly erroneous, although others given on the point correctly express it, for in that case they are contradictory and liable to mislead.

2. ————: ————: **Wilfully Defined in One: Supplies "With Intent to Kill" in Another.** Where one instruction defined "wilfully as intentionally, not accidentally," that "if the defendant intended to kill, such killing is wilful," and "in the absence of qualifying facts and circumstances the law presumes that a person intends the ordinary and probable result of his acts," the word "wilfully" used in other instructions supplied the omission of the words "with intent to kill"—the meaning being the same.

3. ————: ————: **Defining Heat of Passion.** Where one instruction contains the words "a violent passion suddenly aroused by reason of said Henry Kenner having shot at or wounded the defendant with a pistol" and "then such heat of passion which may have been aroused in defendant by reason of said Kenner shooting at or wounding the defendant with a pistol," there is no necessity for a further definition of the words "heat of passion."

4. ————: ————: **Cured by Other Words.** But if a further definition of the words "heat of passion" were necessary, the defect was supplied by another instruction which concluded with the words: "And when this passion is produced by an assault or personal violence, and such passion thus aroused is so violent as to render one not unconscious of the act, but deaf to the voice of reason, and under the control of such passion he suddenly acts, it is not an act of deliberation or of malice."

Appeal from St. Charles Circuit Court.—*Hon. B. H. Dyer,* Judge.

AFFIRMED.

*Theodore C. Bruere* for appellant.

(1) The instruction 13 is erroneous in that it authorizes the jury to find the appellant guilty of mur-der in the second degree without requiring the jury to find that appellant intentionally killed the deceased. State v. Wieners, 66 Mo. 23; State v. Shock, 68 Mo. 552; State v. Elsey, 201 Mo. 572; State v. Harris, 76 Mo. 361; State v. Minor, 193 Mo. 597. (2) The instruction 14 is erroneous in that it authorizes the jury to find the appellant guilty of manslaughter in the fourth degree without requiring the jury to find that appellant intentionally killed deceased. State v. Elsey, 201 Mo. 572. (3) The instruction 15 is erroneous in that the court did not define the term "heat of passion." State v. Strong, 153 Mo. 555; State v. Andrew, 76 Mo. 101; State v. Skaggs, 159 Mo. 581.

*John T. Barker,* Attorney-General, for the State; *Paul P. Prosser,* of counsel.

(1) Instructions must be considered all together. The word "wilfully," as used in the instructions, is defined in instruction 11 as follows: "The court instructs the jury that as used in the instructions the word 'wilfully' means intentionally; that is, not accidentally. Therefore, if the defendant intended to kill, such killing is wilful. In the absence of qualifying facts and circumstances, the law presumes that a person intends the ordinary and probable results of his acts." Reading into the other instructions the definition of the word "wilfully," as contained in this instruction it becomes manifest at once that the essential element of intent to kill is not ignored in

the former. State v. Hyland, 144 Mo. 312; State v. Smith, 164 Mo. 585; Wharton on Homicide (3 Ed.), sec. 111, p. 158; State v. Kinder, 184 Mo. 295. (2) For the reasons assigned under the preceding point, the definition of the word "wilfully," as contained in instruction 11, is also a complete answer to appellant's contention that the court ignored the element of an intent to kill in instruction 14 upon the subject of manslaughter in the fourth degree. (3) Appellant complains that instruction 15 is erroneous, in that the court did not define the term "heat of passion." We direct the court's attention to instruction 12, in which the term is plainly defined and contradistinguished from a cool state of the blood, and which concludes with the following words: "And when this passion is produced by an assault or personal violence, and such passion thus aroused is so violent as to render one not unconscious of the act, but deaf to the voice of reason, and under the control of such passion he suddenly acts, it is not an act of deliberation or of malice." More than that, in the very instruction of which appellant now complains the term is sufficiently defined in the words, "a violent passion suddenly aroused by reason of said Henry Kenner having shot at or wounded the defendant with a pistol," as well as in the words subsequently used in the same instruction, "then such heat of passion, which may have been aroused in defendant by reason of said Kenner shooting at or wounding the defendant with a pistol," etc. No further definition was necessary. State v. Rose, 142 Mo. 429; State v. Kinder, 184 Mo. 297.

WALKER, J.—The defendant was charged in an information filed by the prosecuting attorney of St. Charles county with murder in the first degree in having killed one Henry Kenner. Upon a trial defendant was found guilty of murder in the second de-

gree and his punishment assessed at imprisonment in the penitentiary for a term of ten years; after sentence, upon compliance with the necessary formal procedure, he appealed to this court.

The defendant, deceased, and many of the witnesses were negroes.

The evidence, as has been graphically said by Mr. Prosser in his brief for the State, is marred by that "indefiniteness as to distance, direction and time, characteristic of the testimony of persons of this race."

The killing occurred during a dance at the house of one Al. Galloway, somewhere between one and three o'clock of the morning of February 12, 1911. The difficulty between defendant and deceased began about forty-five yards from the Galloway house. The only persons present at its inception, aside from the defendant and the deceased, were Sallie Abbington and Mildred Galloway, two negro women who corroborated each other as to the essential matters about which they testify. They stated that they were standing talking to the deceased, who was familiarly called "Pat," when the defendant came up and reached out like he was going to choke the deceased. The Galloway woman says defendant had a knife in his hand at the time. Deceased said, "Go on away, I don't want to have any trouble with you." Defendant again reached out and grabbed the deceased, who said: "Go away from here or I will shoot you." Defendant persisted in his efforts to provoke a difficulty, and as he again grabbed the deceased, the latter shot him. The defendant then knocked the deceased down, and in the scuffle the latter dropped his gun. Defendant then commenced to beat the deceased, and called for his brother, Buck Johnson, who was in the house dancing, to come and help him. As Buck came, he said, "What's the matter?" Defendant replied, "He shot me," and Buck said, "Kill him;" and defendant and

Buck commenced to beat the deceased. The women, Sallie Abbington and Mildred Galloway, tried to pull defendant and Buck off the deceased, and he got away and ran toward Galloway's house, with Buck and defendant in pursuit—the latter with a knife in his hand. As the deceased ran around a corner of the house, Buck caught him by the coat collar, knocked him down, and defendant again jumped on him.

Virgil Bailey, who lived near at hand, had gone down to Galloway's house while the dance was in progress, and had left there about one o'clock. Just as he had gotten opposite his barn, he heard a gun shot, and in about five minutes he walked back to Galloway's house. At the corner of the house he found defendant "sitting straddle" of the deceased, punishing him in the face and "stomping" him with his feet. At that time all Virgil heard defendant say was, "Pat, he shot me;" but the witness stated that he left right away and went back to his house.

Other witnesses testified that defendant continued to beat and stamp the deceased, and that he waved the crowd back, saying, "get back, get back; you all see where he shot me, and we will both die together; I am going to kill him." At the same time defendant asked for a knife and one Dine Hunter came up and said, "No, we are not going to let him kill him," and called upon the crowd to help pull defendant off the deceased. Al. Galloway also intervened, and as he took hold of defendant, the latter said, "Let me alone, Galloway; he shot me and I want to kill him." Galloway pulled defendant off and Hunter helped the deceased, who was bleeding from nose and mouth and ears, upon his feet. Deceased was told to run and he ran south from Galloway's house in the direction of the Bailey place. After the deceased had gone, defendant showed Galloway where he had been shot, and Galloway then went back into the house.

Many of the guests began to leave about this time and the movements of defendant immediately following the difficulty do not fully appear. A witness, Ed McRoberts, testified that "some little bit" after the shot was fired he started home and saw defendant standing by his buggy in the Umpton field, about forty of fifty yards from Galloway's house. Defendant asked McRoberts if he was looking for the deceased. McRoberts said, "No," and defendant said "I am looking for him." Clara and Mildred Galloway, who had started towards their home at Gilmore, also encountered defendant in the field, and he threatened to shoot them if they "meant to give him up." John Bailey testified that after the trouble he went up the hollow into the Umpton field, where his attention had been attracted by a man's hallooing, "Bring me a gun,'' and found that the man was defendant. Defendant told Bailey that the deceased had shot him for nothing and he wanted him as a witness. Bailey said to defendant, "Who's here with you?" and defendant replied, "My friend, Pat's, here with me— he's laying right over there and trying to sneak off, and I am laying here watching him." Bailey then asked, "What's the matter with Pat?" and defendant said, "He's just possuming; he shot me—now he wants to get away, but I am laying here watching him; I ain't going to let him sneak off after he shot me that way." Bailey also testified that he "saw something lying there," and was "pretty sure" it was a human being; and that he "heard some kind of a noise like snoring, when a man is asleep."

Virgil Bailey also heard defendant hallooing in the Umpton field, and upon going there saw defendant and near him the deceased, who was lying upon his face. Defendant said to Virgil, "Pat shot me; get a doctor." Virgil said, "All right, if you will come and go with me;" but defendant replied, "No, I can't go." Virgil then went to Galloway's house, and about

five minutes returned to where defendant was in the Umpton field. In the meantime, Willie Johnson, Buck's son, had driven down into the field with the buggy in which defendant had come to the dance. Virgil had assisted defendant into the buggy twice, when Buck Johnson and John Love drove up and insisted upon defendant's going home. The deceased was then lying on the ground, face down, and could be heard breathing hard. Defendant refused to go with Buck and John Love, and finally said, "If you are going to take me home, I will kill this son-of-a-bitch before I go." Defendant then got out of the buggy and walked around to where the deceased was lying, and proceeded to kick him and jump up and down on him with his feet. It was then about two o'clock. The others drove off, leaving the buggy, and Virgil went home and got a horse and started for a Dr. Reed. Afterwards defendant drove to the division fence between the Umpton field and Galloway's place, and after hallooing awakened Galloway and told him to go down to the bridge and look for the gun with which the deceased had shot him. Defendant then drove down across the field towards a gate leading into the county road. Dr. Reed had already been summoned, and Virgil met him on his way to the scene of the killing. Returning with the doctor, they met defendant in the buggy, by himself, driving towards Wentzville. Virgil accompanied Dr. Reed to the place in the Umpton field where the deceased was lying, about two or three hundred yards from Galloway's house. After a hurried examination of the deceased, the doctor pronounced him dead. Later the body was removed and buried the next day. On the following day it was exhumed at the order of the coroner and an inquest held. An autopsy showed that the deceased had received numerous wounds. The left eye appeared to have been shoved in, and well-defined shoe heel prints were over both eyes and extended across the fore-

head. There was a small hole in the lower lip, a number of teeth had been knocked out above and the gum badly caved in by a lick or kick from without. On the back of the head were wounds which appeared to have been made with a stick, and which showed the skull had been fractured. In the opinion of Dr. Arnold, the coroner, "any lick with a foot that is strong enough to leave the impression of the heel on the forehead is dangerous, and possibly in this case it was the mortal wound."

Upon his arrival at Wentzville, an examination was made of defendant's wound, and he was taken to the county infirmary, where he remained from February 12th to April 10, 1911.

Defendant was wearing big, heavy, laced brogan shoes, and blood was on them.

In his own behalf, defendant testified as follows:

"I went there [to the dance] about half past eleven and stayed there until about three o'clock or a quarter to three. I said, 'I am going home,' then I walks out the door and Sallie Abbington follows me out, and I walks to the buggy. Me and Sallie were talking and turned and walks back going to the house, . . . and I crossed the bridge, a little board plank is there across the branch, and I went across first and took ahold of her and helped her across them planks, and we met Kenner [the deceased] and Mildred standing there side of this path, and before getting up to Kenner and Mildred, Pat [deceased] says, 'I am going to put the "bibby" on them'—I didn't know he was talking to me, so we walks on up, Mildred standing out here over the gun, and Pat says, 'You don't believe I will put it on you do you?,' and the gun fired and I fell flat. I raised on my side and I said, 'Kenner, what in the name of the Lord did you shoot me for, what have I done to you in my life?' He said, 'I didn't shoot you,' and I said, 'Kenner, what did you

shoot me for? I am dying; I can't get my breath,' and he said, 'Al. Galloway told me to shoot you.' About that time Al. Galloway runs up with a gun and throws it in my face, Kenner stood by the side of Mildred, and this whole crowd runs out of the house and Kenner started in this direction to the house past me, and Dine Hunter threw a rock and struck Kenner, and John Love and this McRoberts man kicked him several times and said, 'You will never shoot another man.' And Al. Galloway stood there with his gun in his hands, and says, 'Boys, you will have to pick him up from there; you can't let that man lay there.' And John Love and Virg. Bailey and Ed. McRoberts and another man, I forgot who it was, picked this man up and went around the corner of the house with him, and at that time I was in so much misery, I don't know whether they took him in the house or where they taken him to, and I never saw any more of them since. . . . The whole host stomped him, and when John Love kicked him, he fell, and John Love hit him and said, ''You son-of-a-bitch, you will never kill another man,' and he was laying flat on his back, and they was all stomping him in the face, and Virg. Bailey kicked him and said, 'I thought that was old Charley Johnson.' I never saw him [the deceased] any more when Al. Galloway gave them the order, 'You will have to move him away from here'—I never saw Pat Kenner no more from that time to this—I never saw him in the spirit, because I never put the weight of my hand on him. . . . When Pat Kenner had shot me and all of them come up in this way, my brother's boy come and looked at me, and I said, 'Boy, go and get the doctor as quick as you can,' and the boy ran straight up the hill to Bailey's. My brother's boy, Willie, come back and said, 'The doctor's on his road, Uncle, come on and get to the buggy,' and I said, 'No, leave me lay here; let me die on the ground,' and he took hold of me and helped me to the buggy,

and he got me in the buggy and when he did get me in, I had to get on my knees; I couldn't even stand up or sit up. . . . I was sick and I wasn't able to drive no horse, and I suppose he took me there [to town]. . . . And I want to tell you one thing, that Pat Kenner and me never had a cross word in our life."

On cross-examination defendant · stated he had never struck the deceased in his life; also that he never saw the gun with which the deceased shot him, as Mildred Galloway had her hand over it. That after shooting him, the deceased turned and ran to the barbed wire fence, where he got caught in the wire; and that "they beat him while they had him in that fence." Defendant denied that he saw John Bailey in the Umpton field that night, as Bailey had testified, and that the last thing he remembered was "when the boys were helping him in the buggy when he was lying down on his side and knees." Defendant also testified that he got shot about three o'clock, as near as he "could guess it."

The gun-shot wound defendant received was on the right side of the abdomen, near the lower region of the sixth rib. While such an injury would cause pain, it would have no material effect upon physical exertion, was the opinion of Dr. Bitter, the county physician; Dr. Arnold, the coroner, and Dr. Mortgner stated that a man sustaining such a wound would be capable of running and jumping within an hour after receiving the same. It was the opinion of Dr. Reed, however, that such an injury would interfere with physical exertion. Dr. Reed also testified that when he examined defendant shortly after the difficulty, the latter was drunk. There was evidence offered on the part of defendant tending to show previous good character.

In rebuttal, Virgil Bailey denied that he had stamped the deceased, as testified to by defendant, and

Sallie Abbington and Mildred Galloway denied defendant's version of the manner in which the difficulty between him and the deceased had begun.

The court instructed the jury on murder in the first degree, the second degree, and manslaughter in the fourth degree; the presumption of innocence; defining a reasonable doubt; prescribing the punishment if found guilty of either of the degrees of homicide defined; the weight to be given defendant's testimony; that the jury are the judges of the credibility of witnesses and the weight of their testimony; the weight to be given evidence as to defendant's good character; the influence of motive upon the jury's finding; *alibi;* and defining the technical words used in the indictment for murder in the first degree.

The defendant's motion for a new trial is in the usual general form, without any special allegations of error. Counsel for defendant complains here only of the giving of instructions numbered 13, 14, and 15; the first and second were in regard to murder in the second degree and manslaughter in the fourth degree respectively; and defendant's complaint is that in neither was the jury required to find an intention to kill on the part of the deceased to render the defendant guilty of the crime charged; the giving of the third, numbered 15, is assigned as error because it did not define "heat of passion."

The errors complained of in regard to the instructions are those of omission, and not of an express character, as when an instruction in terms incorrectly declares the law. Errors of omission may be cured by the giving of other instructions which supply the omitted parts, and thus complete the declarations of law necessary to enable the jury to correctly find upon the matter at issue. This is what is meant when it is said that instructions are sufficient when, "taken as a whole, they correctly declare the law." This

Instructions:
Omissions.

cannot be said of instructions if one of them is expressly erroneous, because its tendency may be to mislead the jury, although all of the others may properly declare the law applicable to the case. The burden of defendant's complaint is omission from the instructions of alleged necessary words. This error, if it exists, may be cured by the use of other words conveying the same meaning as those omitted, or, by the court giving other instructions which by their terms cure the defect.

An examination of all of the instructions given discloses that the one numbered "eleven" clearly and correctly defines all the technical words nec- *Wilfully: Intent to Kill.* essary to be used in instructions in a trial for murder; among these is the word "wilfully," which is defined as "intentionally, not accidentally," that "if the defendant intended to kill, such killing is wilfull," and, "in the absence of qualifying facts and circumstances, the law presumes that a person intends the ordinary and probable result of his acts." It will be found that instructions numbered "thirteen" and "fourteen" each require the jury to find that the defendant wilfully committed the act which resulted in the death of the deceased. Things equal to the same thing are equal to each other, and the use of the word wilfully, therefore, supplies the omission of the words "with intent to kill," complained of by defendant.

Precedents are not lacking in support of this conclusion. In State v. Hyland, 144 Mo. l. c. 311, an instruction almost identical in form with that defining murder in the second degree here, was approved by this court. In that case, as in the case at bar, the word "wilfully" and the other technical words necessary to be employed in cases of homicide had been defined in other instructions, but the words "with intent to kill" are omitted.

In State v. Smith, 164 Mo. l. c. 585, the court approved instructions almost identical with those complained of here, and in so doing said: "While the instruction under comment did not, in so many words, tell the jury that such an intent was necessary, it did tell them that if defendant 'wilfully,' etc., struck and killed Henry Watson with billiard cues they would find him guilty, while the third instruction defined wilfully as being intentionally and not accidentally. If then the word wilfully means intentionally, they mean one and the same thing, and the use of the word wilfully was all that was necessary."

The following cases announce the same dostrine: State v. Kinder, 184 Mo. 276; State v. John, 172 Mo. l. c. 226; State v. Barrington, 198 Mo. l. c. 105.

Instruction numbered 15 given by the court is complained of because it did not define the term "heat of passion." This instruction contains, among others, the following words: "A violent passion suddenly aroused by reason of said Henry Kenner having shot at or wounded the defendant with a pistol," as well as the words subsequently used in the same instruction: "then such heat of passion which may have been aroused in defendant by reason of said Kenner shooting at or wounding the defendant with a pistol." In State v. Rose, 142 Mo. l. c. 429, the court in discussing an instruction similar in terms to that under consideration said: "A final contention is that the court failed to define 'heat of passion,' as used in the instructions, but this seems to be a misapprehension of the only instruction in which those words are used, to-wit, the fifth, wherein it is said, 'while the defendant was in violent passion, suddenly aroused by reason of Wells having shoved him, or struck him with his fist or hand,' or that defendant shot and killed Wells 'while in a violent passion, suddenly aroused by a shove or a blow from Wells.' No further defini-

Heat of Passion: Definition.

tion was necessary." If this ruling was not conclusive of this question, the giving by the court of instruction numbered 12 in the case at bar cured any defect in the instruction complained of.

Instruction numbered 12 concludes as follows: "And when this passion is produced by an assault or personal violence, and such passion thus aroused is so violent as to render one not unconscious of the act, but deaf to the voice of reason, and under the control of such passion he suddenly acts, it is not an act of deliberation or of malice." This in our opinion is sufficient to enable the jury to intelligently determine what is meant by "heat of passion."

A careful consideration of this entire record justifies the conclusion that the defendant was given a fair and impartial trial. The killing was brutal, and the defendant has had the benefit of the services of able and industrious counsel in the trial court and on appeal. Finding no reversible error, the judgment of the trial court is affirmed, and it is so ordered.

*Brown, P. J.,* and *Faris, J.,* concur.