THE PEOPLE, PLAINTIFF AND RESPONDENT, *v.* CONCEPCIÓN, DEFENDANT AND APPELLANT.

APPEAL from the District Court of San Juan, Section 2, in a Prosecution for Murder in the First Degree.

No. 662.—Decided July 31, 1914.

APPEAL—MURDER IN FIRST DEGREE—SENTENCE OF DEATH.—The provisions of section 1 of Act No. 10 of March 9, 1911, show that the Legislature deemed it indispensable that an appeal should actually be taken in order that it might exist in a case of murder in the first degree in which sentence of death had been pronounced, and it was not the intention of the Legislature that the said cases should be considered appealed automatically to the Supreme Court merely because they were cases of murder in the first degree in which sentence of death had been pronounced.

ID.—MURDER IN FIRST DEGREE—JURISDICTION.—In order that the Supreme Court may acquire jurisdiction of an appeal in a case of murder in the first degree in which sentence of death has been pronounced, the accused or his attorney must take such appeal.

TACIT REPEAL—CONSTRUCTION OF LAW.—Tacit repeals are not favored by law and any doubt should be decided against the intention of changing the law and the established procedure of many years.

APPEALS IN CRIMINAL CASES.—The provisions of Act No. 10 of March 9, 1911, did not repeal section 347 of the Code of Criminal Procedure relative to decisions which are appealable in criminal cases.

APPEAL—ATTORNEY.—For an appeal to have effect, the wish of the party to appeal must be manifest, and even where a statute provides the contrary, an attorney, in view of his duty to act according to the instructions of his client, would not be entitled to appeal against the wish of the latter.

ID.—MURDER IN FIRST DEGREE.—The object of Act No. 10 of 1911 is only to impose upon the attorney for the accused the duty of prosecuting an appeal in cases of capital punishment and that this court, in order to decide it, have before it a statement of the evidence introduced at the trial, whether the same be prepared by the attorney or by the judge who presided at the trial.

The facts are stated in the opinion.

*Mr. Charles E. Foote, fiscal,* for The People.

*Mr. José de J. Tizol* for the appellant.

MR. JUSTICE WOLF delivered the opinion of the court.

The question in this case is whether a capital case is automatically transferred to the Supreme Court of Porto Rico by virtue of the Act of March 9, 1911, which provides as follows:

"Section 1.—That in every case in which a sentence of death has been pronounced by a district court, it shall be the duty of the attorney or attorneys for the defendant to take proper appeal of said case to the Supreme Court of Porto Rico.

"Section 2.—That in every such case where the attorney of the defendant has failed, within the time limited by law, to have a proper record prepared for transmission to the Supreme Court, as above provided, the secretary of the district court shall notify the district judge of that fact, and it shall then become the duty of the said judge within thirty days thereafter to prepare and certify in the form most convenient to him, a statement of the evidence submitted to the jury; and the said district judge is authorized to extend the time within which the secretary shall forward the transcript of record to the Supreme Court in compliance with the provisions of this law.

"Section 3.—All laws or parts thereof in conflict herewith are hereby repealed."

It will be noticed that section 1 makes it the duty of the attorney or attorneys to "take proper appeal" to the Supreme Court of Porto Rico. Hence the Legislature regarded it as necessary for an appeal to be taken, and if an appeal is to be taken, any intention on the part of the Legislature automatically to transfer a capital case to the Supreme Court is negatived. To put it in another way, if the case were

automatically transferred by virtue of its being a capital one, there would be no necessity of imposing a duty on the attorney to take an appeal.

The second section assumes that an appeal has been taken and the case transferred to the Supreme Court of Porto Rico. By its terms it refers not to the failure of an attorney to take an appeal, but solely to his failure to bring up the record. The section presupposes that jurisdiction of the case has already been acquired by the Supreme Court of Porto Rico by appeal taken by the attorney. When the attorney, then, fails to prepare a proper record, jurisdiction having already been transferred, it becomes the duty of the judge on proper notice to prepare a "statement of the evidence submitted to the jury." The judge is authorized to extend the time for transmitting the record in order, it is to be presumed, that the statement of the case to be prepared by the judge may be added to the judgment-roll in accordance with the provisions of section 356 of the Code of Criminal Procedure. The second section relates solely to the preparation of the statement of the case and its addition to the transcript. It has no bearing on the acquisition by this court of jurisdiction. The words "as above provided" are anomalous, because the duty to appeal does not include the duty to prepare a record. They are only explained, perhaps, by the use of the words "proper appeal." The Legislature, in the first section, may have intended the word "proper" to cover the preparation of the record as well. The duty of the lawyers would be then not only to appeal, but to prepare a record and the words "as above provided" would be explicable. They are mere surplusage otherwise.

There are more general considerations. Section 345 of the Code of Criminal Procedure provides that either of the two parties may appeal to the Supreme Court on questions of law alone, as prescribed in the chapter.

Section 347 provides that an appeal may be taken by the defendant, (1) from a final judgment of conviction, (2) from

an order denying a motion for a new trial, (3) from an order made after judgment affecting the substantial rights of the party. These were all the provisions of law before March 9, 1911, by which a defendant might appeal to the Supreme Court. In the Act of March 9, 1911, three is ont the slightest word making reference to these sections or showing any direct disposition to modify or amend them. Repeals by implication are not favored in the law and every doubt must be taken against an intention to change the law and the steady practice of years.

Everywhere the will of the party to appeal must be displayed. The primary duty of the attorney is to follow the instructions of his client and, the words of the statute to the contrary notwithstanding, we do not think an attorney would have the right to appeal against the will of his client. There is no provision in the law facing the moment when the case would be transferred if it be urged that the case was automatically transferred. Is the case instantly transferred to the Supreme Court on the rendition of judgment or on the failure of the attorney to appeal? When does the time for preparing the transcript begin to run and why should it be necessary to extend the time as provided by section 2, unless it was intended that the case should follow the rules provided in every other criminal case and require the intervention of the party or his attorney?

In the case at bar the judge prepared a statement and the secretary transmitted the record, but there was no appeal. Hence, this court never acquired jurisdiction and we have no authority to consider the merits of the pleading or the trial.

The law had no other purpose than to impose upon the attorney the duty of taking an appeal in capital cases, as well as to provide that this court, in deciding such appeals, should always be furnished with a statement of the evidence which was submitted to the consideration of the jury and which must have been prepared by the attorney, or, upon

his failure to do so, by the trial judge, thus avoiding what has often occurred previously in many cases, that is, that due to said failure in filing such statement of facts we have been compelled to confine our consideration of the case only to the question of whether the information was sufficient or the instructions given by the judge to the jury were correct.

The case must be dismissed or filed away for lack of appeal.

*Dismissed.*

Chief Justice Hernández and Justice Aldrey concurred. Justices del Toro and Hutchison dissented.

DISSENTING OPINION OF MR. JUSTICE DEL TORO IN WHICH MR. JUSTICE HUTCHISON CONCURRED.

This is a criminal action in which the defendant was sentenced to death. The *fiscal* of the District Court of San Juan, Section 2, charged Mateo Concepción with the crime of murder in the first degree committed on the person of Serafina Dones in this city of San Juan early on the morning of September 8, 1912. The accused entered a plea of not guilty. The trial was had before a jury which, on January 16, 1913, returned a verdict finding Concepción guilty as charged. The defendant, through his attorney, moved for a new trial. The court overruled the motion and entered judgment on the verdict on February 11, 1913, sentencing the defendant, Mateo Concepción, to death.

The first question we must consider is whether or not we have jurisdiction of this appeal.

An examination of the transcript of the record shows that it does not contain a notice of appeal from the judgment or from the ruling refusing to grant a new trial, there appearing an endorsement made by the secretary of the trial court which reads as follows: "Notice of appeal. The attorney for the defendant did not file a notice of appeal because the

case is one of murder in the first degree." The statement of the case was prepared by the trial judge who stated therein that he did so "in compliance with section 2 of the Act approved March 9, 1911, and for the purposes of the appeal."

The transcript having been brought up to this court, the attorney for the accused failed to file a brief although he had applied for and obtained an extension of time in which to do so, and the hearing having been set for May 29, 1914, the said attorney did not appear, but merely asked by telephone that the hearing be adjourned on account of sickness.

In the year 1902 a new system of penal laws was inaugurated in Porto Rico by the adoption of a Penal Code and Code of Criminal Procedure.

By the said system judgments rendered by district courts with or without trial by jury are final in criminal actions and enforceable immediately unless appealed from.

Appeals are governed by sections 345 to 369 of the Code of Criminal Procedure, some of which have been amended by subsequent acts of the Legislative Assembly. Sections 6383 to 6415 of the Compilation of the Revised Statutes and Codes of Porto Rico.

In 1902 there was no difference between appeals in capital cases and in other cases except as to that referring to a stay of execution of the judgment. In accordance with section 353 an appeal immediately stayed the execution of the judgment in capital cases and in other cases the execution was stayed "upon filing with the clerk of the court in which the conviction was had, a certificate of the judge of such court, or of a judge of the Supreme Court, that, in his opinion, there is a probable cause for the appeal."

In 1903, Acts of 1903, p. 46, it was enacted in general terms that "An appeal to the Supreme Court from a judgment of conviction, stays the execution of the judgment," thus tacitly repealing the provision of section 353 relative to the certificate to be filed in order to secure a stay of the execution of the judgment.

In 1911 Act No. 10 regarding appeals in capital cases was enacted. The said act contains only three sections, a literal copy of which is as follows:

"Section 1.—That in every case in which a sentence of death has been pronounced by a district court, it shall be the duty of the attorney or attorneys for the defendant to take proper appeal of said case to the Supreme Court of Porto Rico.

"Section 2.—That in every such case where the attorney of the defendant has failed, within the time limited by law, to have a proper record prepared for transmission to the Supreme Court, as above provided, the secretary of the district court shall notify the district judge of that fact, and it shall then become the duty of the said judge within thirty days thereafter to prepare and certify, in the form most convenient to him, a statement of the evidence submitted to the jury; and the said district judge is authorized to extend the time within which the secretary shall forward the transcript of record to the Supreme Court in compliance with the provisions of the law.

"Section 3.—All laws or parts thereof in conflict therewith are hereby repealed."

What is the scope of the act quoted? Does it provide for an appeal *de officio* in all capital cases, or does it only impose upon the attorney for the defendant the duty to appeal, and does the Supreme Court acquire jurisdiction only when the attorney complies with that duty?

In our opinion it cannot be denied that Act No. 10 of 1911 brought about a change in the system of penal law in force since 1902 by establishing a distinction between appeals in capital cases and all other cases. Section 1 makes it the duty of the attorney for the defendant to appeal, and section 2 foresaw the case in which the said attorney should fail to comply with his duty and provided that then it should become the duty of the trial judge "to prepare and certify, in the form most convenient to him, a statement of the evidence submitted to the jury," the secretary being charged with the duty of sending up the transcript of the record to the Supreme Court.

This being so, we are of the opinion that our jurisdiction is manifest and, therefore, we will proceed to the consideration and decision of the questions involved, but not without first censuring the conduct of counsel for the defendant both in the lower court and in this court.

It appears from the transcript of the record that the defendant moved the trial court for a new trial on the ground that the following errors had been committed:

1. The verdict rendered is not the impartial expression of all the jurors.

2. The jury was erroneously impanelled.

3. Juror Fernández Mascaró was challenged without cause.

4. The defendant was illegally denied his right to challenge some of the jurors peremptorily.

5. The jury was erroneously instructed as to the probatory force of the testimony of witness Amparo Zeno.

6. The instruction relating to "extenuating circumstances" is contradictory and detrimental to the defendant.

7. The verdict is contrary to the law and the evidence.

Let us see whether the said errors were committed by the district court.

1. When the jury returned to the courtroom with the evrdict it was polled, and juror Anibal Herrera asked the court if he might be excused from answering. The court replied in the negative and thereupon the juror said that the verdict rendered was his verdict. We cannot agree with the defendant that it follows as a consequence of the above-described fact that the verdict was not the impartial expression of the opinion of the jury. See the case of *The People* v. *David,* 19 P. R. R., 762.

2. We have examined the method followed in impanelling the jury and it conforms to the provisions of law as construed by this court in the case of *The People* v. *Morales, alias Yare Yare,* 14 P. R. R., 227.

3. The record shows the following to have taken place in relation to juror Fernández Mascaró: *Fiscal.* Are you op-

posed on principle to the death penalty? Juror. On principle I am not in favor of capital punishment. *Fiscal.* If the law should fix a verdict carrying the death penalty in certain cases would you be prepared to give a verdict impartially? Juror. Not being in favor of it on principle I would have to force myself. The *fiscal* challenged this juror and was sustained by the court. The defense noted an exception.

In our opinion the court did not commit the error attributed to it. Although juror Mascaró did not state positively that he was prevented from rendering his verdict because of his opinions, he said that he would have to force himself because he was not in favor of the death penalty on principle, and in similar cases the courts have held that the challenge is well founded. See *State* v. *Banerly* (Mo.), 46 S. W., 609, and *Rehea* v. *State* (Neb.), 88 N. W., 789, 792 and 793.

4. The fourth assignment of error is closely related to the second. After examining a large number of jurors who were challenged, some for cause and others peremptorily, by both parties, twelve were finally selected and the court thereupon invited the defendant to exercise his right to peremptory challenge, whereupon the defendant stated that he wished it to go on record that he accepted the last juror selected, José Rosado, and that he again asked permission to challenge peremptorily the remaining jurors. The court refused such permission and the defense noted an exception. According to the procedure which had been followed the defense had already had an opportunity to challenge peremptorily each and all of the members of the jury and what the defense asked for was a second opportunity. The ruling of the court was in strict accordance with law and jurisprudence. See section 221 of the Code of Criminal Procedure, the case of *The People* v. *Yare Yare,* already cited, and the case of *The People* v. *Vázquez,* 20 P. R. R., 338. In the first of the said cases this court, basing its opinion on the juris-

prudence of the Supreme Court of California, expressed itself through Mr. Justice MacLeary as follows:

"\* \* \* in criminal cases, in forming the jury, 12 names must be drawn from the box containing the names of the qualified jurors, and the defendant may examine the whole twelve before exercising his right of peremptory challenge as to any of them, and those not challenged or excused must then be sworn to try the case; after which as many more names as will make up the deficiency must be drawn from the box; when the same process will be repeated until the jury is complete." *The People* v. *Morales, alias Yare Yare,* 14 P. R. R., 227.

In order to close the discussion as to this alleged error, we will say that the defendant challenged about 12 jurors and there is absolutely nothing in the record to show that the jury which finally tried him was not a perfectly impartial jury.

5. Witness Amparo Zeno had been convicted previously of the offence of contempt committed by testifying falsely before the court. The judge mentioned this fact in his charge to the jury, but stated that this fact did not necessarily imply that no credence should be given to the testimony of the witness, especially as her testimony had been corroborated by that of Delfina Lamboy. This, in synopsis, is what occurred, and we are unable, therefore, to conclude that the court committed any fundamental error which would require the reversal of the judgment.

6. In referring to "extenuating circumstances" the judge said to the jury in his instructions that it could find a verdict of guilty of murder in the first degree with extenuating circumstances, and also that it was the general rule that the evidence of such circumstances should be submitted to the trial court prior to the pronouncement of judgment.

Section 202 of the Penal Code reads as follows:

"Every person guilty of murder in the first degree shall suffer death, or if there be extenuating circumstances, shall suffer confine-

ment in the penitentiary for life; or upon a plea of guilty, the court shall determine the same; and every person guilty of murder in the second degree, is punishable by imprisonment in the penitentiary not less than ten years.

"Whenever, in a proper case, the judgment of the court directs the death of the defendant, the punishment is inflicted."

And section 320 of the Code of Criminal Procedure reads as follows:

"After a plea or verdict of guilty, where a discretion is conferred upon the court as to the extent of the punishment, the court, upon the oral suggestion of either party that there are circumstances which may be properly taken into view either in aggravation or mitigation of the punishment, may, in its discretion, hear the same summarily, at a specified time, and upon such notice to the adverse party as it may direct."

The sections of the Penal Code of California, Montana and Idaho which correspond to section 202 of the Penal Code of Porto Rico, materially differ. Section 190 of the Penal Code of California provides that every person found guilty of murder in the first degree shall suffer the death penalty or imprisonment for life at the discretion of the jury trying the case; that when the accused pleads guilty the court will determine the punishment, and that every person found guilty of murder in the second degree shall be punished by imprisonment in the penitentiary for not less than 10 years; and by section 353 of the Penal Code of Montana and section 4868 of the Code of Idaho it is provided only that every person guilty of murder in the first degree shall suffer the death penalty, and every person convicted of murder in the second degree shall be punished by imprisonment in the penitentiary for not less than 10 years, which may be extended to life imprisonment.

The sections of the Codes of Criminal Procedure of the said three States corresponding to section 320 of our Code of Criminal Procedure are the same, but we have been un-

able to find any decision applicable to the present case among the authorities usually consulted when construing our present Penal Code, nor have we been able to find any in the distinguished work of Wharton on Homicide.

It has been the practice in Porto Rico since the adoption of the new Penal Code to allow the jury to weigh the extenuating circumstances, if any, in returning its verdict. We do not believe that such practice is contrary to law, nor do we see any reason for recommending that this practice be discontinued in the future.

Now, the fact that the jury has that power in murder cases does not mean that in such cases the procedure established by section 320 of the Code of Criminal Procedure may not be applied also. Hence, we are unable to conclude that the instructions referred to are erroneous. On the other hand, the defendant has not shown that there are any real extenuating circumstances which could operate in his favor to mitigate the degree of punishment. From the evidence, as we shall see later, it appears that the accused sustained illicit relations with his victim nad that even after they had been broken off he objected to her having such relations with other men, as it appears she did have. This gave rise to his desire to murder her. Such circumstances are pertinent to explain the motive for the crime, but not to mitigate the penal liability of the culprit. "And jealousy or a desire for revenge furnishes no excuse, justification or extenuation for homicide." Wharton on Homicide, p. 202, citing *State* v. *Burns,* 148 Mo., 167, Am. St. Rep., 588; *Ex parte Jones,* 31 Tex. Crim. Rep., 422, 20 S. W., 983. See also page 930 of the same work.

7. Lastly, let us see whether the verdict is contrary to the law and the evidence as the defendant maintains. Dr. Cueto, a surgeon and physician, testified that on the afternoon of September 8, 1912, he performed an autopsy on the body of a young woman of 20 years of age named Serafina Dones, whom he had attended at daybreak of the same day,

when she was at the point of death. The body of the deceased showed the following wounds: An incised wound in the upper part of the breast; two incised wounds in the mammary gland; another in the right side; another deep incised wound reaching to the bone, in the upper part of the right arm; two others in the same arm; three in the left arm; another in the upper part of the left thigh; another in the upper part of the left leg which fractured the fibula; two other slight wounds in the same leg and another in the foot, and, lastly, a transverse wound in the abdomen causing the intestines to protrude. Two of the wounds were the principal cause of her death—the one in the thoracic cavity and the other one in the abdomen, causing internal hemorrhage. In the opinion of the doctor, a large number of the wounds were inflicted while the victim was lying on her back and her assailant was standing, and there was no sign on the body of the deceased which would indicate that there had been any struggle.

Francisco García, who lived in the same room with the defendant, testified that the defendant told him on one Monday that he had broken off his relations with Serafina more than a month ago; that on Thursday of the same week he also told him that he was going to buy a knife in order to revenge himself on Serafina Dones; that about eight o'clock on the evening of September 7, or Saturday of the same week, he was standing with the defendant on San José Square when Serafina passed accompanied by soldier García, and the defendant said to Serafina Dones, "You will not enjoy those shoes which you have bought because I am going to kill you tonight."

Soldier Manuel García testified that he went with Serafina Dones on September 7 to buy some shoes; that upon their return about 8 or 9 p. m. they crossed San José Square and Serafina, upon seeing the defendant standing there, said to the witness, "This man has sworn to kill me;" that they passed in front of the defendant who said to Sera-

fina, "You will not enjoy those shoes because I am going to kill you." That he left Serafina at her house and at daybreak of the following day he learned that she had been murdered.

Juan Boto, a clerk in a hardware store, testified that at about 3.30 p. m. of September 7 he sold to a person resembling the defendant a knife of the same kind as that which had been shown him at the trial and which was seized by the police (testimony of Francisco García and Enrique Pino) in the possession of the mother of Mateo Concepción.

Modesta Ferrer testified that she saw the defendant pass in front of the house where Serafina lived at about 10 and 11.30 p. m. on September 7.

Delfina Lamboy, who slept in a room separated by a screen from the room in which Serafina slept, heard the latter cry out at about daybreak on September 8. She got up and saw the defendant stabbing Serafina. She screamed and the defendant ran away, whereupon she went to the assistance of Serafina, who got up from the cot and fell to the floor covered with blood. The witness went out into the yard and met Amparo Zeno who said, "It is Mateo," and left hurriedly in search of the police.

Amparo Zeno, who also lived in the same house with Serafina and who had got up at daybreak on September 8 to prepare for her work, heard Delfina Lamboy shout out that Serafina had been killed and at that moment saw the defendant leave the room barefooted, and the witness ran after him calling to the police to arrest him.

This is, in general terms, the result of the evidence for the prosecution, but it contains even more details tending to show premeditation on the part of the defendant. The crime committed by Mateo Concepción partakes, therefore, of all the characteristics of murder in the first degree, and in so considering and finding neither the jury nor the court, in our opinion, committed any error.

The judgment should be affirmed.